**STATESMAN SAVINGS HOLDING CORP., et al., and Glendale Federal Bank, FSB, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Nos. 90–773C, 90–772C.**

United States Claims Court.

July 24, 1992.

---

Charles J. Cooper, with whom were Michael Carvin, Robert J. Cynkar, and Vincent J. Colatriano, Washington, D.C., for plaintiff Statesman Sav. Holding Corp.

Jerry Stouck, with whom were Paul G. Gaston, Joe G. Hollingsworth, Donald W. Fowler, and Charles J. Fromm, Washington, D.C., for plaintiff Glendale Federal Bank, FSB.

James J. Gilligan, with whom was Anne L. Weismann, in Statesman Sav. Holding Corp., Patricia Leitner, with whom were Anne L. Weismann and David J. Anderson, in Glendale Federal Bank, FSB, U.S. Dept. of Justice, Civil Div., and Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C., for defendant the U.S.

SMITH, Chief Judge.

## OPINION

Plaintiffs Statesman Savings Holding Corp. (Statesman) and Glendale Federal Bank, FSB (Glendale) both acquired failing savings and loan institutions prior to the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA).[1] Both Statesman and Glendale, like the plaintiffs in *Winstar Corp. v. United States*, 21 Cl.Ct. 112 (1990) (*Winstar I*), claim that the enactment of FIRREA breached their contracts with the government and effected a taking in violation of the fifth amendment. Presently before the court are Statesman's and Glendale's Motions for Summary Judgment as to Liability. After careful consideration of the briefs submitted by the parties, and after oral argument, the court grants both motions. The court defers consideration of Statesman's and Glendale's taking claims under the well-established principal that constitutional claims should be addressed only if a plaintiff's other bases for recovery do not afford complete relief. *See Sun Oil Co. v. United States*, 572 F.2d 786, 215 Ct.Cl. 716, 769 (1978). The court also consolidates these cases with *Winstar Corp. v. United States*, No. 90–8C, and certifies them, with *Winstar*, for interlocutory appeal to the United States Court of Appeals for the Federal Circuit.

## FACTS

On April 21, 1992, this court issued its opinion in *Winstar Corp. v. United States*, 25 Cl.Ct. 541 (1992) (*Winstar II*), a case presenting legal issues identical to those in dispute here and in other related cases.[2]

---

1. Pub.L. 101–73, 103 Stat. 183 (Aug. 9, 1989). FIRREA is codified at various sections of Title 12 of the United States Code.

2. As of the date of this opinion, complaints have been filed in fifteen other cases besides *Winstar*, *Statesman* and *Glendale*: *La Van v. United States*, No. 90–581C (filed June 28, 1990); *Barron Bancshares, Inc. v. United States*, No. 90–830C (filed Aug. 28, 1990); *Hometown Financial, Inc. v. United States*, No. 90–843C (filed Aug. 30, 1990); *Hughes v. United States*, No. 90–878C (filed Sept. 5, 1990); *Suess v. United States*, No. 90–981C (filed Sept. 14, 1990); *Castle v. United States*, No. 90–1291C (filed Sept. 25, 1990); *American Heritage Bancorp v. United*

In *Winstar II*, the court considered the nature and effect of pre-FIRREA negotiated agreements between acquiring savings and loans, such as Statesman and Glendale, and the government, acting through the Federal Home Loan Bank Board (FHLBB) and the Federal Savings and Loan Insurance Corporation (FSLIC). This court ruled in *Winstar I* that the agreement between the government and the acquiring savings and loan in that case constituted a contract. This court held in *Winstar II* that the contract was a traditional one, like those upheld by the Supreme Court in *Perry v. United States*, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935) and *Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), and not a government grant as found in *Bowen v. Public Agencies Opposed to Social Sec. Entrapment*, 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986) (*POSSE*). This court further found that the enactment of FIRREA breached that contract in light of the sovereign acts doctrine. This court deferred consideration of the *Winstar* plaintiffs' taking claim. *See Winstar II*, 25 Cl.Ct. at 543 n. 4.

On the day it issued its opinion in *Winstar II*, the court ordered the parties in all *Winstar*-related cases to address how the court's opinion impacted upon the existence of a contract and the breach of that contract in their particular cases. In a status conference on May 4, 1992, the court further ordered that an expedited briefing schedule be set in the *Statesman* and *Glendale* cases so that the court could promptly rule on the two plaintiffs' pending motions for summary judgment and thereby enable the parties to seek an interlocutory appeal before the United States Court of Appeals for the Federal Circuit with *Winstar II*. Although Statesman and

Glendale moved for summary judgment independently, the court heard oral argument on both motions on June 23, 1992 because *Statesman* and *Glendale* present common legal issues not treated in *Winstar II*. The court resolves Statesman's and Glendale's motions in one opinion.

## I. Statesman

At issue in this case is Statesman's 1988 acquisition of four insolvent savings and loans, one in West Palm Beach, Florida, First Federated Savings Bank, and three in Waterloo, Iowa, First Federal Savings, Peoples Savings & Loan, and The Perpetual Savings & Loan. The acquisition was a result of year-long negotiations between Statesman and FHLBB and FSLIC. The negotiations began in 1987 when Statesman approached the FHLBB about acquiring a subsidiary of an insolvent savings and loan institution in Florida, First Federated. In response to Statesman's proposal, FSLIC advised Statesman that the government could assist Statesman in its acquisition of the subsidiary only if it acquired First Federated itself. FSLIC also advised Statesman that under then-existing regulations entities such as Statesman (which were affiliated with investment banking companies) could acquire a failing savings and loan only if the acquired thrift's assets exceeded $500 million. To reach this asset level, FSLIC offered to combine Statesman's acquisition of First Federated with three other thrifts located in Iowa. Statesman accepted FSLIC's offer.

As part of the transaction, FSLIC agreed to provide Statesman with a cash contribution of $60 million. A portion of that contribution, $26 million,[3] was to be permanently credited to Statesman's regulatory capital for purposes of meeting FHLBB's

*States*, No. 90–3982C (filed Dec. 3, 1990); *Anderson v. United States*, No. 91–34C (filed Jan. 10, 1990); *Karnes County Savings v. United States*, No. 91–993C (filed Mar. 7, 1991); *Globe Savings Bank, FSB v. United States*, No. 91–1550C (filed Oct. 29, 1991); *California Federal Bank, FSB v. United States*, No. 92–138C (filed Feb. 28, 1992); *Secor Bank, FSB v. United States*, No. 92–247C (filed Apr. 8, 1992); *Republic Savings Bank, FSB v. United States*, No. 92–265C (filed Apr. 13, 1992); *Glass v. United States*, No. 92–428C (filed June 25, 1992); and *Coast Feder-*

*al Bank, FSB v. United States*, No. 92–466C (filed July 9, 1992).

3. Part of the capital contribution, $5 million, was in the form of a 10–year subordinated debenture delivered to FSLIC by Statesman. Statesman was obligated under the terms of that debenture to pay back $5 million of the $26 million total capital contribution made to Statesman by FSLIC.

minimum capital requirements. This $26 million figure has been referred to throughout the litigation as a "capital credit." [4] FSLIC also agreed to allow Statesman to employ the purchase method of accounting for the transaction. Under this method, Statesman was permitted to report as an asset includible in capital for purposes of satisfying minimum capital requirements the difference between the aggregate fair market value of liabilities assumed by Statesman and the aggregate fair market value of the assets of the four acquired institutions (including the $60 million cash contribution made by FSLIC). *See generally Winstar I,* 21 Cl.Ct. at 113. This difference in value, known as "supervisory goodwill," was $25.8 million. Statesman was permitted to amortize this intangible goodwill asset on a straight-line basis over a twenty-five year period. In addition to agreeing to acquire the four insolvent thrifts, Statesman agreed to contribute $21 million in cash to the thrifts' capital base.

The terms of the agreement between the government and Statesman were memorialized in an Assistance Agreement. A key provision of the Agreement was an "integration clause," which specified the documents that would control the interpretation of the parties' agreement.

> This Agreement, together with any resolutions adopted by the Bank Board [FHLBB] and documents delivered at closing ... constitutes the entire agreement between the parties and supersedes all prior agreements ... excepting only the Acquisition Agreement, the Merger Agreements and any resolutions or letters concerning the Acquisition, the Mergers of this Agreement issued by the Bank Board or the [FSLIC] in connection with the approval of the Acquisition, the Mergers and this Agreement, *provided,* however, that in the event of any conflict, variance, or inconsistency between this Agreement and the Acquisition Agreement or the Merger Agreements,

the provisions of this Agreement shall govern and be *binding on all parties* insofar as the rights, privileges, *duties, obligations,* and *liabilities of the parties* are concerned.

Assistance Agreement at 96–97 (March 11, 1988) (emphasis in original). One of the documents deemed controlling by the Assistance Agreement was FHLBB Resolution 88–169, which was issued contemporaneously with the Assistance Agreement. In that Resolution, the government expressly agreed to provide Statesman with the aforementioned capital credit.

> Twenty-one million dollars of the initial contribution by [FSLIC] to [Statesman], and five million dollars of the principal amount of the Subordinated Debenture issued to the FSLIC ... shall be credited to the regulatory capital account of [Statesman]....

FHLBB Resolution 88–169 at 19 (March 11, 1988); *see also* Assistance Agreement at 45 ("$26 million of the contribution made [by FSLIC] ... shall be credited to [Statesman's] regulatory capital account and shall constitute regulatory capital....."). In that same Resolution, the government also expressly assented to the use of the purchase method of accounting for the acquisition.

> The value of any unidentifiable intangible assets [goodwill] resulting from accounting for the Acquisition and the Mergers in accordance with the purchase method of accounting may be amortized by [Statesman] over a period not in excess of twenty-five (25) years by the straight line method....

FHLBB Resolution No. 88–169 at 20. In accordance with the terms of the Assistance Agreement, the parties consummated the transaction on March 11, 1988.

In 1989, FIRREA became law. FIRREA altered existing regulations both to reduce the amount of supervisory goodwill includible in calculating core capital and to permit supervisory goodwill to be amortized for no more than 20 years. [5] *See* 12 U.S.C.

---

**4.** "Capital credit" has been a part of only one other *Winstar*-related case before the court,

*Globe Savings Bank, FSB v. United States,* No. 91–1551.

**5.** FIRREA mandates the phasing out of the use

§§ 1464(t)(3)(A) and (9)(B); *Winstar I*, 21 Cl.Ct. at 114. FIRREA also established new regulatory capital standards.[6] After FIRREA took effect, Statesman fell below the three new capital standards established by the Act: $13.8 million below the tangible capital standard; $13.2 million below the core capital standard; and $14.5 million below the risk-based capital standard. But for FIRREA, Statesman would be $10.8 million above the tangible capital standard; $11.4 million above the core capital standard; and $7.7 million above the risk-based capital standard.[7] As a result of Statesman's failure to meet the FIRREA capital standards, the Office of Thrift Supervision (OTS) appointed the Resolution Trust Corporation (RTC) as receiver for Statesman on July 26, 1990. Thus, but for the enactment of FIRREA, Statesman would be operating today.

## II. Glendale

The transaction at issue in this case is Glendale's 1981 acquisition of a failing savings and loan institution in Fort Lauderdale, Florida, First Federal Savings and Loan Association of Broward County. Unlike the transactions at issue in *Winstar* and *Statesman*, Glendale negotiated the merger of First Federal into Glendale without initial input from FHLBB or FSLIC. Presumably motivated by economic necessity, First Federal initiated the transaction by contacting Glendale about a possible merger. After negotiation, the parties executed on November 12, 1981 a Merger Agreement pursuant to which the merger ultimately occurred.

The Merger Agreement was expressly conditioned on FSLIC's approval of the merger and its assent to allowing Glendale to use the purchase method of accounting. On November 19, 1981, seven days after the Merger Agreement was signed, Glendale and FSLIC entered into a Supervisory Action Agreement, which manifested the government's approval of the terms of the merger as set forth in the Merger Agreement.

> [Broward] had incurred significant losses and its financial condition is such that remedial action must be taken.
>
> FSLIC has decided … to provide assistance as set forth in this Agreement, having determined that [Broward] is in danger of default and that the nature and/or amount of such assistance would be less than the losses FSLIC would sustain upon the liquidation of [Broward] through a receivership accompanied by the payment of insurance of accounts.

Supervisory Action Agreement at 1–2 (November 19, 1981). As was the case in the Statesman transaction, the Agreement between Glendale and FSLIC contained an integration clause which specified the documents that would control the interpretation of the parties' agreement. The clause provided:

> This Agreement, together with an interpretation thereof or understanding agreed to in writing by the parties, constitutes the entire agreement between

---

of supervisory goodwill in calculating core capital. Prior to January 1, 1992, the amount of supervisory goodwill includible in core capital cannot exceed 1.5% of total assets. Thereafter, the amount of supervisory goodwill includible in core capital declines each year, so as not to exceed 1.0% of total assets through December 31, 1992; not to exceed 0.75% of total assets through December 31, 1993; and not to exceed 0.375% of total assets through December 31, 1994. 12 U.S.C. § 1464(t)(3)(A).

**6.** FIRREA requires federally insured thrifts to satisfy three capital standards: "tangible," "core," and "risk-based" capital. 12 U.S.C. §§ 1464(t)(1), (2) and (3). Thrifts must maintain "tangible" capital in an amount not less than 1.5% of assets excluding supervisory goodwill. 12 U.S.C. § 1464(t)(2)(B). Thrifts must maintain "core" capital in an amount not less than 3% of assets. 12 U.S.C. § 1464(t)(2)(A). Supervisory goodwill may be used in calculating "core" capital, but subject to the schedule set forth in 12 U.S.C. § 1464(t)(3)(A), which decreases the includible amount. *See* note 5, *supra*. Thrifts must maintain "risk-based" capital in an amount not "materially" less than that required by the Comptroller of the Currency for national banks. 12 U.S.C. § 1464(t)(2)(C). Supervisory goodwill is includible for purposes of calculating "risk-based" capital. *Id.*

**7.** By contrast, the court notes that even if the government had honored its obligation to the *Winstar* plaintiffs, Winstar would still most likely have fallen below the three new FIRREA capital standards.

the parties thereto and supersedes all prior agreements and understandings of the parties in connection herewith, excepting only the Agreement of Merger and any resolutions or letters issued contemporaneously herewith by the FHLBB or the FSLIC, *provided,* however, that in the event of any conflict, variance or inconsistency between this Agreement and the Agreement of Merger, the provisions of this Agreement shall govern and be binding on all parties insofar as the rights, privileges, duties, obligations, and liabilities of the FSLIC are concerned.

Supervisory Action Agreement at 14 (emphasis in original). One of the documents FHLBB issued contemporaneously with the Agreement was a "forbearance letter" dated November 19, 1981. In that letter, the government manifested its intention to forbear from exercising its authority to bring enforcement proceedings against Glendale for failing to satisfy regulatory capital requirements "following the merger." FHLBB forbearance letter (November 19, 1981). The letter, however, did not specifically address the use of the purchase method of accounting for the merger.

Another document designated in the Agreement as controlling the parties' relationship, FHLBB Resolution 81–710, however, did reflect the government's understanding that supervisory goodwill would be part of the transaction. That resolution provided:

> Not later than sixty days following the effective date of the merger, Glendale shall furnish an opinion from its independent accountant, satisfactory to the Supervisory Agent, which (a) indicates the justification under generally accepted accounting principles *for use of the purchase method of accounting for its merger with Broward,* (b) specifically describes, as of the Effective Date, any goodwill or discount of assets arising from the merger to be recorded on Glendale's books, and (c) substantiates the reasonableness of amounts attributed to goodwill and the discount of assets and the resulting amortization periods and methods; and

> Glendale shall submit a stipulation that any goodwill arising from this transaction shall be determined and amortized in accordance with FHLBB Memorandum R–31b; ...

FHLBB Resolution 81–710 at 2 (November 19, 1981) (emphasis added). The FHLBB Memorandum R 31b referenced in the Resolution specifically dealt with the use of supervisory goodwill in acquisitions of failing or insolvent thrifts. In its first paragraph, the Memorandum stated that its purpose was to

> set[ ] forth guidelines for the staff of the Federal Home Loan Bank Board in reviewing the proposed accounting, under generally accepted accounting principles, for goodwill arising in the acquisition of a savings and loan association. This intangible asset generally results when the purchase price for an institution exceeds the fair value of the assets acquired, reduced by the fair value of any liabilities assumed. It only arises when the accounting for a business combination is in accordance with the purchase method.

FHLBB Memorandum R 31b at 1 (September 1, 1981). The Memorandum also established forty years as the maximum amortization period for supervisory goodwill. *Id.* at 2.

On March 19, 1982, Glendale supplied to FHLBB the opinion letter outlining the amount of supervisory goodwill used in the merger as required by FHLBB Resolution 81–710. The opinion letter stated:

> Pursuant to the provisions of the Agreement of Merger between [Glendale] and Broward dated November 20, 1981 and the Supervisory Action Agreement between [Glendale] and the Federal Savings and Loan Insurance Corporation (FSLIC) dated November 20, 1981, upon the effective date of November 20, 1981, [Glendale] accounted for the acquisition using the "Purchase Method" of accounting.... $18,000,000 of the resultant goodwill is associated with the savings deposit base and will be amortized on a straight line basis over 12 years, the estimated life of the savings deposit base. The remaining goodwill of $716,-

666,000 will be amortized on a straight line basis over 40 years as [Glendale] believes that the remaining goodwill has an indefinite life since it is related to expansion of operations into an entirely new market area.

Letter from David T. Hansen of Glendale to FHLBB (March 19, 1982) (forwarding Peat, Marwick, Mitchell & Co. letter to Glendale). The government does not dispute that the terms of the opinion letter were deemed "satisfactory to the Supervisory Agent" as required by FHLBB Resolution 81–710. It is also uncontroverted that the government manifested its approval of the terms set forth in the opinion letter *prior* to the effective date of the Supervisory Action Agreement. In a letter from H. Brent Beesley, then-Director of FSLIC, to FHLBB dated November 19, 1981, FSLIC recommended the use of the purchase method of accounting for the merger. Beesley explicitly referred to a Peat, Marwick, Mitchell & Co. opinion letter dated November 10, 1981 setting forth the specific amount of supervisory goodwill projected to be amortized pursuant to the merger, assuming the use of the purchase method of accounting. It was only after sending this letter that FSLIC entered into the Supervisory Action Agreement. Taken in conjunction with contemporaneously issued FHLBB letters and resolutions, then, the Supervisory Action Agreement called for the use of the purchase method of accounting and the amortization of an intangible supervisory goodwill asset over periods of twelve and forty years. *See* FHLBB Press Release at 3 (November 20, 1981) ("Glendale Federal will account for this merger under the purchase accounting method which provides that assets and liabilities will be recorded at a fair value on the effective date (11/19/81). Any excess of fair value of liabilities over fair value of assets will be recorded as goodwill. A portion of the goodwill has been associated with the savings deposit base and amor-

tized over the 12–year estimated life of the savings base. Remaining goodwill will be amortized on a straight line basis over 40 years.").[8]

After the enactment of FIRREA in 1989, Glendale remained in compliance with all three new regulatory capital standards set forth in the Act, the "tangible," "core," and "risk-based" capital requirements as defined by 12 U.S.C. § 1464(t)(2). As of March 31, 1992, however, Glendale has fallen out of compliance with the "risk-based" capital standard. In addition, in calculating these three capital amounts, Glendale has been required by FIRREA to exclude considerable amounts of supervisory goodwill. In calculating its "tangible" capital, Glendale has been required to exclude from the original $734.6 million of supervisory goodwill agreed to by the parties all goodwill not amortized prior to the enactment of FIRREA. *See* 12 U.S.C. § 1464(t)(2)(B). In calculating its "core" and "risk-based" capital, Glendale has been required under 12 U.S.C. § 1464(t)(3)(A) to deduct all but approximately $185 million of the $734.6 million of goodwill originally contemplated by the parties. Because of FIRREA, Glendale also cannot amortize over forty years the amount of goodwill that is allowable under the Act. *See* 12 U.S.C. §§ 1464(t)(3)(A) and (9)(B). FIRREA has also caused Glendale to suffer monetary loss. The exclusion of supervisory goodwill has: required Glendale to implement costly measures to compensate for the loss of goodwill from its regulatory capital amounts; constrained capital resources and thereby restricted business opportunities; and adversely affected the confidence of Glendale's investors.

## DISCUSSION

### I. The Existence of a Contract

#### A. *Statesman*

■ In *Winstar I*, this court examined the various documents memorializing the

---

8. The only cash payment involved in the transaction was made pursuant to the interest rate protection provision of the Agreement. Under that provision, Glendale and FSLIC agreed that each would make payments to the other (according to terms set forth in the Agreement) for a five-year period depending on whether the interest rates rose or fell from the time of the merger. If interest rates rose, FSLIC would pay Glendale; conversely, if they dropped, Glendale would pay FSLIC. Pursuant to this provision, Glendale ultimately paid FSLIC $18.4 million.

parties' intentions and determined that an implied-in-fact contract existed. *Winstar I,* 21 Cl.Ct. at 114–15. Here, by contrast, the government readily concedes that an express contract existed, at least in regard to the $26 million capital credit extended by the government to Statesman. In regard to the supervisory goodwill at issue, the government simply argues that because there was an express contractual relationship, embodied in the Assistance Agreement, the absence of any reference in that Agreement to the use of the purchase method of accounting necessarily implies that there was no contractual agreement as to that term. Plaintiff conversely argues that, taken together, the documents comprising the parties' relationship expressly provide for the use of supervisory goodwill.

The issue of whether a contractual right to use supervisory goodwill existed turns on a proper interpretation of the integration clause in the Assistance Agreement. As noted above, the integration clause provided that the parties' contractual relationship was defined not only by the Assistance Agreement, but also by contemporaneously issued FHLBB resolutions and documents relevant to the transaction: "This [Assistance] Agreement, together with any resolutions adopted by the Bank Board [FHLBB] and documents delivered at closing ... constitutes the entire agreement between the parties and supersedes all prior agreements...." Assistance Agreement at 96–97. The plain language of this clause indicates that all FHLBB resolutions delivered at closing constituted binding provisions of the parties' express contract. The clause thus clearly encompasses FHLBB Resolution 88–169 which was issued the same day as the Assistance Agreement. Accordingly, because FHLBB Resolution 88–169 provided for the use of the purchase method of accounting, the court finds that the government and Statesman had an express contract providing for the use of that accounting method. This reading of the integration clause finds support from those courts construing similar assistance agreements. *See, e.g., Hansen Savings Bank v. Office of Thrift Supervision,* 758 F.Supp. 240, 245 (D.N.J.

1991) (finding an FHLBB resolution and forbearance letter incorporated by an integration clause as part of the parties' agreement); *Transohio Savings Bank v. Director, Office of Thrift Supervision,* 967 F.2d 598, 617–18 (D.C.Cir.1992) (same); *Carteret Savings Bank, FA v. Office of Thrift Supervision,* 762 F.Supp. 1159, 1171–72 (D.N.J.1991) (same), *rev'd on other grounds,* 963 F.2d 567 (3d Cir.1992).

### B. *Glendale*

■ Although the specific terms of the agreement between the government and Glendale are not as easily derived from the relevant documents as is the case in *Statesman,* the court nonetheless is compelled to reach the same conclusion: that an express contract existed between the government and Glendale. As in *Statesman,* the government and Glendale entered into an express agreement (the Supervisory Action Agreement) regarding the government's approval and role in Glendale's acquisition of a failing savings and loan. Also like *Statesman,* the express agreement refers explicitly to documents calling for the use of the purchase method of accounting.

The government maintains, however, that there was no contractual relationship, express or implied, between the government and Glendale. As it does in the *Statesman* case, the government argues that the Supervisory Action Agreement constitutes the only expression of the parties' understanding concerning the merger of Glendale and Broward and the government's role in that merger. In support of its position, the government points to the language of the integration clause, which is materially the same as the one at issue in *Statesman.*

This Agreement, together with an interpretation thereof or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties thereto and supersedes all prior agreements and understandings of the parties in connection herewith, *excepting only the Agreement of Merger and any resolutions or letters issued contemporaneously herewith by the FHLBB or the FSLIC ....*

Supervisory Action Agreement at 14 (emphasis added). The government contends that the FHLBB resolutions and letters issued contemporaneously with the Agreement do not reflect actual terms of the parties' contractual relationship. The government argues that these resolutions should not be read in conjunction with the Supervisory Action Agreement because that Agreement only incorporates "interpretation[s]" and "understanding[s] agreed to in writing by the parties."

This reading of the integration clause, however, if not totally wooden, is directly at odds with the clause's plain language. The government ignores the "excepting" phrase of the clause and argues that all documents other than the Supervisory Action Agreement must, to be part of the parties' agreement, interpret an "understanding agreed to in writing by the parties." The "excepting" phrase, however, exempts both the Agreement of Merger and "any resolutions or letters issued contemporaneously" by FHLBB or FSLIC from such a qualification. These documents, as the language of the integration clause makes clear, are specifically excepted from the first phrase of the clause and need only be relevant to the Agreement and the merger transaction to have meaning in regard to the contractual terms and intentions of the parties. The government thus cannot suggest that the integration clause *precludes* the court from considering these FHLBB resolutions and forbearance letters in construing the nature and terms of the contractual relationship between the government and Glendale.

The government also attempts to distinguish this case from *Winstar* by arguing that the forbearance letter in this case differs materially from the one found critical to determining the nature of the parties' agreement in *Winstar I*. The *Winstar* forbearance letter explicitly "confirmed" the parties' "understanding" in regard to the use of supervisory goodwill. *See Winstar I*, 21 Cl.Ct. at 115. The Glendale forbearance letter, by contrast, does not mention the use of supervisory goodwill. This fact

alone, however, does not contradict the court's finding that an express contract existed in regard to the use of the purchase method of accounting. The court's ultimate finding in regard to the existence of a contract is based not only on the forbearance letter, but on the other contemporaneous documents flowing between the parties. As discussed above, these documents—the Supervisory Action Agreement, FHLBB Resolution 81–710, FHLBB Memorandum R 31b, the November 10, 1981 and March 19, 1982 Peat, Marwick, Mitchell & Co. opinion letters, and the November 19, 1981 letter from the Director of FSLIC, H. Brent Beesley to FHLBB—reflect the parties' express understanding regarding the use of supervisory goodwill amortized over twelve-year and forty-year periods of time. The forbearance letter merely confirms what is eminently clear from these other documents: that FHLBB agreed to forbear from exercising its authority to bring enforcement proceedings against Glendale for failure to meet regulatory capital standards.

## II. Contract Breach
### A. *Statesman*

■ In *Statesman*, as in *Winstar*, the issue of contract breach is a relatively straightforward one. By enacting FIRREA, the government "altered existing regulations both to reduce the amount of supervisory goodwill includible in calculating core capital and to permit supervisory goodwill to be amortized for no more than twenty years." *Winstar II*, 25 Cl.Ct. at 549. As this court held in *Winstar II*, the act of altering the terms of the parties' original agreement, "absent a countervailing contractual right to do so," constituted a breach of contract entitling Statesman to damages or restitution. *Id.* at 550.

The government contends, however, for the first time in this two year-old litigation, that in this case, unlike in *Winstar*, the government possessed such a countervailing contractual right to alter the terms of the parties' original agreement.[9] The pro-

9. The government raised this argument for the     first time in *Statesman* on June 12, 1992, in its

vision of the Assistance Agreement which accords the government this right, the government argues, is the so-called "unlawful inaction clause." The clause provides:

> This Agreement and the parties' rights and obligations under it shall be governed by the law of the State of Iowa, to the extent that Federal law does not control. *Nothing in this Agreement shall require any unlawful action or inaction by either party.*

Assistance Agreement at 96 (emphasis added). The government maintains that this clause unambiguously provided that, although the government agreed that Statesman could treat the $26 million capital credit and $25.8 million in supervisory goodwill as capital for purposes of satisfying minimum regulatory capital standards, the government made no commitment that Statesman could continue to do so if statute or regulation later provided to the contrary. The government argues that a failure by OTS to give effect to FIRREA's provisions would have constituted "unlawful inaction" on the government's part.

After examining both the language and location of the clause, however, the court must reject the government's interpretation of the "unlawful inaction clause." The clause, embedded within the Governing Law section of the Assistance Agreement, is a boilerplate clause which is contained within several of the Assistance Agreements at issue in the *Winstar*-related cases presently before this court, including *Winstar* itself. The fact that the government has made this argument in only one other case, *Glendale*, and only at this late juncture in *Statesman* certainly undermines the government's contention that this clause constituted a specially negotiated and unambiguous contractual right to alter the terms of the parties' original agreement. In the *Statesman* case alone, this identical clause is contained within the four merger agreements by which Statesman acquired the four insolvent thrifts. In the drafting of those four documents, Statesman and the four insolvent thrifts had no

concerns, as the government and Statesman did in the context of drafting the Assistance Agreement, about continuing obligations or executory terms that might be subject to a future change in law. It defies logic to suggest that the "unlawful inaction clause" has one meaning in the context of the four merger agreements and a different, and in this case dispositive, meaning in the context of the Assistance Agreement. Moreover, if this clause is given the meaning the government urges, the clause would contradict another provision of the Assistance Agreement providing that "[n]o amendment or modification of this Agreement shall be binding unless executed in writing by the parties or their successors." Assistance Agreement at 97. If the parties thus had agreed not to modify or vary the terms of the agreement without mutual consultation and bargain, it would flout reason to believe that the parties had also agreed to allow the government to retain the power to alter the terms of the agreement at will.

A narrower reading of the clause is more plausible and logical under the circumstances of this and other *Winstar*-related cases. The clause was designed to ensure that the contract would not be read to require a violation of any *then-existing* state or federal laws. No party in any *Winstar*-related case would contest the fact that the transactions at issue were complex and negotiated under severe time pressures. In this regard, the *Statesman* case is typical. The transaction involved four thrifts located in two states. The clause was undoubtedly included within the governing law section of the assistance agreements as a protective measure to ensure that the parties had not inadvertently agreed to violate laws in effect at the time the parties contracted.

Moreover, to read the clause as the government suggests would require the court to view the agreement as an illusory bargain. If the clause in fact reserved to the government the right to cancel without lia-

---

Response to Plaintiffs' Status Report. In *Glendale,* the government first raised this argument in its October 15, 1990 Motion to Dismiss. To

date, the government has not raised this argument in *Winstar.*

bility its obligations should Congress or FHLBB in the future change the relevant statutory or regulatory scheme, then the contract could not be binding. Under such a contract, the government would in effect be agreeing to abide by its promises only so long as it unilaterally decided to keep those promises. A contract so construed would not be an enforceable contract. *See Flagship Fed. Sav. Bank v. Wall,* 748 F.Supp. 742, 748 (S.D.Cal.1990) (finding an agreement between the government and an acquiring savings and loan "illusory" because the government "had the right at any time to cancel its side of the bargain" without liability); *see also* 17 C.J.S. *Contracts* § 98 ("[A] promise, the performance of which depends on the mere option, will, inclination, or discretion of the promisor, as where the promisor is free to perform his promise or withdraw from the arrangement at his unrestricted pleasure, is merely illusory, and is insufficient consideration for the promise made by the other party."). The court will not read contracts, negotiated with care over many months as illusory, based upon a boilerplate clause. As the Supreme Court observed in quoting Alexander Hamilton, a contract with the government so construed would

> involve two contradictory things: an obligation to do, and a right not to do—an obligation to pay a certain sum, and a right to retain it in the shape of a tax. It is against the rules, both of law and of reason, to admit by implication in the construction of a contract a principle which goes in destruction of it.

*Murray v. Charleston,* 96 U.S. 432, 445, 24 L.Ed. 760 (1877).

Even assuming that the government considered reserving the right to unilaterally cancel its obligations without liability, the court points out that the government knew exactly how to make such a reservation when that was its intent. In *Guaranty Financial Services v. Ryan,* 928 F.2d 994, 999 (11th Cir.1991), the parties' agreement provided that "[a]ll references to regulations of the [FHLBB] or the FSLIC used in this Agreement shall include any successor regulation thereto, it being *expressly understood* that subsequent amendments to

such regulations may be made and that *such amendments may increase or decrease the Acquiror's obligation under this Agreement.*" (Emphasis supplied by the court). Similarly, in *Flagship Fed. Sav. Bank v. Wall,* 748 F.Supp. at 748, the forbearance letter expressly incorporated as part of the parties' agreement provided that "the FHLBB specifically reserves a right to cancel the forbearance at any time if it should find that the forbearance is unsafe or unsound or otherwise actually or potentially detrimental to Flagship." The government, therefore, knew how to reserve to itself the right to change the contract based on a change of law. The government in fact negotiated for that right in some cases.

■ The court accordingly finds that the government possessed no contractually-based right allowing it to abrogate without liability the parties' express contract. The government thus could not be immune from the consequences of its breach unless the enactment of FIRREA was found to be a sovereign act within the meaning of the sovereign acts doctrine. The court concluded in *Winstar II,* however, that FIRREA was not a sovereign act. *Winstar II,* 25 Cl.Ct. at 550–53. As the court noted, under the sovereign acts doctrine, "the government is not contractually liable, absent an express agreement to the contrary, for the consequences of acts performed in its sovereign capacity." *Id.* at 550. The doctrine, however, could not apply in that case, and by the same reasoning in the present cases, because

> taking away plaintiffs' rights in [§§ 1464(t)(3)(A) and (9)(B) ] of FIRREA was not the necessary means to a broad public end, rather it was the government's end goal. On the government's reasoning, *any* statute breaching a contract would be immune under the doctrine merely because its purpose was to breach the contract. This court has never granted government immunity on such a basis.... Although the court accepts as given that the government sought to promote the public welfare in enacting FIRREA as a whole, those spe-

cific provisions of the Act altering the capital treatment of supervisory goodwill were intended to, and did, impact only upon plaintiffs and those similarly situated entities who had acquired savings and loan institutions. This fact compels the conclusion that sovereign act immunity cannot adhere in this and related cases. *Id.* at 552 (emphasis in original). In enacting FIRREA, the government therefore became liable to plaintiff for damages or restitution.

In making this finding, the court notes that it is irrelevant for purposes of determining liability that the government's promise in this case included a capital credit. In *Winstar,* the government's consideration for the agreement only included its assent to the use of supervisory goodwill in satisfying regulatory capital requirements. Here, by contrast, the government agreed not only to allow the use of supervisory goodwill, it also promised to allow a capital credit of $26 million to Statesman. Although FIRREA is silent in regard to capital credits, the government has read FIRREA as disallowing their use in meeting minimum capital requirements. The court cannot find any reason for treating capital credits differently than supervisory goodwill: the government is liable to Statesman for its decision not to honor either of these promises.

### B. *Glendale*

■ As in *Statesman,* the government hinges its contention that FIRREA does not constitute a breach on the "unlawful inaction clause" contained within the parties' Supervisory Action Agreement. The clause in this case, also embedded within the Governing Law section of the Agreement, contains the same language as the clause at issue in *Statesman.*

> This Agreement and the rights and obligations of the parties hereunder shall be governed by the law of the State of California, to the extent that Federal law does not control. *Nothing in this Agreement shall require any unlawful action or inaction by either of the parties hereto.*

Supervisory Action Agreement at 15 (emphasis added).[10] The government's arguments regarding the meaning and effect of this clause mirror those put forward in *Statesman.* Thus for the reasons set forth in *Statesman* above, the court accordingly holds that the "unlawful inaction clause" in the parties' Agreement did not afford the government a contractually-based right allowing it to abrogate without liability the parties' express contract. The government, therefore, is liable to Glendale for damages or restitution.[11]

### III. *Transohio Savings Bank v. Director, Office of Thrift Supervision*

In these and all other *Winstar*-related cases, the government has interpreted the Supreme Court's ruling in *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986) (*POSSE*), to mandate that a contract cannot exist between the plaintiffs and the government. In support

10. The Supervisory Action Agreement, as the one in *Statesman,* contained an express limitation on the ability of the parties to vary the terms of the original Agreement: "[n]o subsequent modification or termination of this Agreement shall be binding unless set forth in writing and executed by the parties or their proper successors." Supervisory Action Agreement at 15.

11. In its Motion to Dismiss, the government argued that Glendale's claims for monetary damages were not ripe as Glendale admittedly met FIRREA's capital requirements at the time it filed its complaint. As of March 31, 1992, however, Glendale has fallen out of compliance with the "risk-based" capital standard set forth in FIRREA. (Glendale was $43 million short of meeting that standard as of March 31, 1992.) As a result, Glendale was required to submit to OTS on June 1, 1992, a capital restoration plan for returning Glendale to capital compliance. A failure by Glendale to comply with that plan subjects it to regulatory sanctions, including seizure. *See* 12 U.S.C. § 1464(t)(6). As noted above, FIRREA has also caused Glendale to suffer monetary loss. Without the inclusion of supervisory goodwill in calculating its capital amounts, Glendale has been forced to: implement costly measures to compensate for the loss of goodwill; constrain capital resources; and lose business opportunities and investor confidence. Glendale, therefore, has suffered an injury sufficiently ripe for adjudication in this court.

of this position, the government has invoked the United States Court of Appeals for the District of Columbia Circuit's recent decision in *Transohio Savings Bank v. Director, Office of Thrift Supervision,* 967 F.2d 598 (D.C.Cir.1992). In that decision, the court affirmed the district court's denial of a preliminary injunction sought by an acquiring savings and loan similarly situated to Winstar, Statesman and Glendale. The injunction, if granted, would have enjoined OTS from enforcing those provisions of FIRREA disallowing and reducing the use of supervisory goodwill in the context of regulatory mergers.[12] Although the *Transohio* court explicitly acknowledged that the district court did not have jurisdiction over the acquiring thrifts "pure contract claims," *see Transohio,* at 601 ("We find ... that the district court did not have jurisdiction over Transohio's pure contract claims because only the Tucker Act, 28 U.S.C. § 1491(a)(1), waives sovereign immunity for Transohio's contract claims, and the Tucker Act provides for jurisdiction in the Claims Court alone."), the court considered the merits of the plaintiff's contract arguments in evaluating the acquiring thrifts' statutory and due process claims. *Id.* In reaching the merits, the *Transohio* court upheld, and in some respects expanded upon, the position taken by the government on the teaching of *POSSE* in the present litigation, a position obviously at odds with the conclusions reached by this court in *Winstar II. See Winstar II,* 25 Cl.Ct. at 545 ("[T]he [Supreme] Court's holding in *POSSE* in no way precludes this court from finding the existence of a contract between the government and plaintiffs. As is evident from its opinion, the Court in *POSSE* recognized that the government has the power to enter into contracts which confer vested rights—rights which the government has a duty to honor."). As the parties here have argued the *Transohio* decision in their briefs, it is therefore this court's duty to consider its

reasoning. While this court is only bound by the United States Court of Appeals for the Federal Circuit's precedent (and of course that of the Supreme Court), it certainly gives due consideration to the views of other courts when not inconsistent with our circuit.

### A. *The Issues*

In reviewing the district court's denial of a motion for a preliminary injunction filed by the acquiring thrift, the *Transohio* court recognized that a contract existed between the acquiring thrift, Transohio Savings, and the government. *Transohio,* at 618 ("We agree with Transohio [Savings] ... that the circumstances of the mergers support a finding that the transaction reflected a voluntary bargain, the terms of which were freely negotiated by the parties and binding on them."). Having recognized the existence of a contract, the court proceeded to address two issues raised in the present litigation: (1) whether, in light of the *POSSE* decision, that contract was one which could bind Congress' power to regulate and (2) whether FHLBB and FSLIC possessed the power to enter into such a contract. *Id.* at 617. After examining the terms of the parties' contract and the statutory language delegating contracting authority to FHLBB and FSLIC, the court found that the answer to the above framed issues was "no." *Id.* at 620, 624. This court addresses these issues and the *Transohio* court's analysis of them in turn.

### B. *"Alleged Power of Agency to Bind Congress"*

■ The *Transohio* analysis of plaintiffs' contract claims offers a novel conception of government structure which is inconsistent with how this court has historically viewed the creation of rights in our constitutional system. Whether an agency has the power to bind Congress is a false issue in all of the *Winstar* cases. Under

---

**12.** All four United States Courts of Appeals which have reviewed preliminary injunction motions seeking to enjoin OTS have ruled against such motions. *See Carteret Sav. Bank, FA v. Office of Thrift Supervision,* 963 F.2d 567 (3d Cir.1992); *Far West Fed. Bank v. Director,*

*Office of Thrift Supervision,* 951 F.2d 1093 (9th Cir.1991); *Guaranty Fin. Servs., Inc. v. Ryan,* 928 F.2d 994 (11th Cir.1991); *Franklin Fed. Sav. Bank v. Director, Office of Thrift Supervision,* 927 F.2d 1332 (6th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991).

our constitutional structure, each branch of government has its respective role and each is equally bound by the Constitution and the laws established by the constitutional process. *See I.N.S. v. Chadha,* 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983) ("The Constitution sought to divide the delegated powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial, to assure, as nearly as possible, that each branch of government would confine itself to its assigned responsibility."). All agencies of the executive branch, other than the President, are established by the Congress, with certain powers and certain duties. By exercising these powers and fulfilling these duties an agency immediately and continuously creates legal effects on private rights. This exercise of power in no way "binds" Congress as a legislative body. It can, however, and continuously does, create rights on the part of private individuals that are held against and restrict government action. Once a salary check is paid, a surplus auto sold, a grant finally delivered, a license issued, a promotion secured, a contract let, or a title transferred, a legal right is created that under the Constitution binds the government. That property right cannot be taken away or diminished by the government without process of law, and in many cases even with process of law, it is immune to recapture. To suggest, then, that an agency action cannot confer rights which the government must honor is to suggest a notion that is as novel as it is anathema to our constitutional system. The power of Congress to legislate is no more bound by the contracts in these cases than it is by the sale of a piece of land by an agency that was authorized by Congress to sell that land. Once the land or action has been taken, Congress cannot return, absent a common law legal right to do so, to the pre-existing legal condition. Once the land is sold or the right granted there is a new legal reality.

On this point, James Madison observed: It is agreed on all sides that the powers properly belonging to one of the departments ought not to be directly and completely administered by either of the other departments. It is equally evident that none of them ought to possess, directly or indirectly, an overruling influence over the others in the administration of their respective powers. It will not be denied that power is of an encroaching nature and that it ought to be effectually restrained from passing the limits assigned to it. After discriminating, therefore, in theory, the several classes of power, as they may in their nature be legislative, executive, or judiciary, the next and most difficult task is to provide some practical security for each, against the invasion of the others. THE FEDERALIST No. 48 (James Madison).

In the present cases, as in *Transohio,* what the acquiring thrifts were in fact required to show was that FHLBB and FSLIC unmistakably contracted with them regarding the use of supervisory goodwill and, in some cases, the use of capital credit. This court, as the *Transohio* court, has found that the rights the acquiring thrifts rely on for recovery "were freely negotiated by the parties and binding on them." *Transohio,* at 618. As the *Transohio* court made clear, "[t]he agencies had no power to compel Transohio to purchase the insolvent thrifts; nor do the banking regulators' promises to Transohio amount to a mere benefit bestowed on the thrift by the largesse of the government." *Id.* The rights at issue here are thus akin to those at issue in *Perry* and *Lynch.* In exchange for legally binding consideration, the government entered into unmistakable contracts conferring vested rights.

In recognizing that binding contractual rights were created and that those rights must be honored, the court stresses what the contrary conclusion entails. The *Transohio* court interpreted the contract between the government and the acquiring thrifts as embodying nothing more than a gamble: "[W]e interpret the contract provisions at issue to mean that the agencies would allow [the acquiring thrift] to treat supervisory goodwill as regulatory capital only as long as the regulatory regime per-

mitted the agencies to do so." *Transohio,* at 620; *see also Guaranty,* 928 F.2d at 999 ("By signing the contract, [the acquiring thrift] took that chance, in effect wagering the chance that the rules would be changed against the potential return if they were not."). Such an interpretation runs counter to the purpose behind the establishment and continued existence of this court. The Claims Court and its predecessor, the Court of Claims, was formed with the purpose of instilling confidence in dealing with the federal government that the government would honor its obligations to its citizens. The court was thus conceived pursuant to the idea, eloquently expressed by President Abraham Lincoln, that "[i]t is as much the duty of government to render prompt justice against itself, in favor of citizens, as it is to administer the same, between private individuals." W. Cowen, P. Nichols, Jr. and M. Bennett, *The United States Court of Claims: A History, reprinted in* 216 Ct.Cl. 1, 20–21 (1978) (quoting 62 Cong. Globe, 37th Cong., 2d Sess., App. at 2 (1862) (President Lincoln's 1861 Annual Message to Congress) (emphasis omitted)). To conclude that all dealings with the government constitute nothing more than "a very elaborate and expensive form of gambling," *Winstar II,* 25 Cl.Ct. at 548, is thus at variance with the very ideal upon which this court, the Tucker Act, and ultimately the rule of law is based.

### C. *The Unmistakability Doctrine*

█ In determining whether the contract between the government and Transohio Savings could bind Congress' power to regulate, the *Transohio* court looked to the language of the parties' agreement. The *Transohio* court proceeded from the assumption that " 'one who wishes to obtain a contractual right against the sovereign that is immune from the effect of future changes in law must make sure that the contract confers such a right in unmistakable terms.' " *Transohio,* at 618 (quoting

*Western Fuels–Utah, Inc. v. Lujan,* 895 F.2d 780, 789 (D.C.Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 47, 112 L.Ed.2d 24 (1990)). The court labelled this principle the "unmistakability doctrine," a "special rule of contract interpretation that applies to contracts with the government." *Transohio,* at 619. Examining the language of the parties' contract, the court concluded that there was "no unmistakable waiver of Congress' regulatory power" and that therefore the government was free to enact FIRREA and breach the parties' contract without liability. *Id.* at 620.

In so construing the unmistakability principle, the *Transohio* court severed the doctrine from its historic moorings. The doctrine has stood for the proposition that any obligation to a private party on the part of the government cannot be implied or presumed, but must be "expressed in terms too plain to be mistaken." *Jefferson Branch Bank v. Skelly,* 66 U.S. (1 Black) 436, 446, 17 L.Ed. 173 (1861). In the Contract Clause [13] cases from which the doctrine arose, it was consistently held to mean that courts must strictly construe contract terms to ensure that any sovereign power of the state, specifically its power to tax, is not constrained without an express intention by the state to bind itself. *See, e.g., Providence Bank v. Billings,* 29 U.S. (4 Pet.) 514, 561–63, 7 L.Ed. 939 (1830) ("That the taxing power is of vital importance; that it is essential to the existence of government; are truths which it cannot be necessary to reaffirm. As the whole community is interested in retaining it undiminished; that community has a right to insist that its abandonment ought not to be presumed, in a case in which the deliberate purpose of the State to abandon it does not appear."); *Keefe v. Clark,* 322 U.S. 393, 396–97, 64 S.Ct. 1072, 1073–74, 88 L.Ed. 1346 (1944) ("Before we can find impairment of a contract we must find an obligation of the contract which has been impaired. Since the contract here relied upon

---

**13.** The Contract Clause of the Constitution provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts...." U.S. CONST. art. I, § 10. The Clause has been understood as "limit[ing] the power of the States to modify their own contracts as well as to regulate those between private parties." *United States Trust Co. v. New Jersey,* 431 U.S. 1, 17, 97 S.Ct. 1505, 1515, 52 L.Ed.2d 92 (1977).

is one between a political subdivision of a state and private individuals, settled principles of construction require that the obligation [to not levy a tax in the future] alleged to have been impaired be clearly and unequivocally expressed.... 'The continued existence of a government would be of no great value, if, by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation,'" (quoting *Charles River Bridge v. Warren Bridge,* 36 U.S. (11 Pet.) 420, 548, 9 L.Ed. 773 (1837))). In other words, courts must examine whether, *in regard to the sovereign power alleged to be constrained,* "[a]ll the basic elements of contract formation [are] present: capacity and mutual intent to contract, arms length negotiation, and the exchange of real obligations for real benefits." *Winstar II,* 25 Cl.Ct. at 547.

The purpose of the doctrine in the context of the Contract Clause was obviously to safeguard the sovereign power of states. The Court recognized that a state's ability to exercise its sovereign powers is so important to the welfare of the general public that any limitation on that ability must be expressed in clear and explicit terms. The Court, however, never held that states could not be bound when they entered into unmistakable contracts. In *Jefferson Branch Bank,* for example, the Court considered whether a bank's state-granted charter created a contract right exempting the bank from taxation imposed by a subsequent statute. In holding that the bank possessed such a right, the court invoked the unmistakability doctrine's historic purpose:

> [T]he vital importance of a State's right to tax was considered, and the relinquishment of it by a State has never been presumed. That language of the court has always been cautious, and affirmative of the right of the State to impose taxes, unless it has relinquished by unmistakable words, clearly indicating the intention of the State to do so. *This court has always said and acted upon it: We will not say that a State may not relinquish its right to tax in particular cases,* or that a consideration sufficiently valuable to induce a partial increase of it may not exist, but as the whole community is interested in preserving it undiminished, it has a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of a State to abandon it does not appear.

*Id.* 66 U.S. (1 Black) at 447, 17 L.Ed. at 179 (emphasis added).

The purpose animating the unmistakability doctrine makes it clear that the doctrine controls how contractual rights with the government are *created, i.e.* whether the government has agreed in unmistakable terms to be contractually bound. The doctrine never has been understood as controlling, as the government has alleged in the *Winstar*-related cases, the effect of the government's *breach* of a contract. *See United States Trust Co. v. New Jersey,* 431 U.S. at 23, 97 S.Ct. at 1518 ("Th[e] [unmistakability] doctrine requires a determination of the State's power to create irrevocable contract rights in the first place, rather than an inquiry into the purpose or reasonableness of the subsequent impairment."). The doctrine solely goes to whether a party possesses contractual rights which are binding and for which damages may be given.

Thus, in *Winstar* and the instant cases, there has been little serious dispute that the government granted the acquiring thrifts, in the clearest possible terms, the right to certain types of regulatory capital treatment. Likewise, the acquiring thrifts have never contended in this court that the government is bound to specifically perform on this obligation. Rather, the dispute has primarily raged over the question of breach. Namely, whether the government must pay damages or provide restitution for its breach, or whether it is excused from such damages by an interpretation of *POSSE* or the sovereign acts doctrine. The historical understanding of the unmistakability doctrine is not applicable to this issue.

This court's understanding of the unmistakability doctrine is thus at odds with the *Transohio* court's analysis. The *Trans-*

*ohio* court held that the government always possesses the power to amend its laws (even if in exercising that power the government alters the terms of an agreement with a private individual) *except* where the private individual has secured in unmistakable terms the government's promise to waive that power in the future. *Transohio,* at 618. In other words, the government has the power to breach a contract with a private individual unless it unambiguously waives that right to breach in the contract itself. This analysis fails to recognize that the "unmistakability" requirement relates to the nature of an agreement between the government and a private individual, *i.e.* whether it is contractual or not. This is also the teaching of *POSSE.* If an agreement of the government to forbear from the exercise of one of its sovereign powers is unmistakably found to be a term of a contract with a private individual, then the government cannot breach the contract without liability. *See Sinking–Fund Cases,* 99 U.S. 700, 719, 25 L.Ed. 496, 504 (1878) ("The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or municipality or a citizen.").

The Supreme Court has never interpreted the unmistakability doctrine as requiring an explicit reference in the contract to the waiver of Congress' power to legislate in the future. In *Perry,* for example, the Court found a binding contractual obligation on the part of the government, which could not be altered by subsequent legislation, even though the bond forming the basis of the parties' agreement never referred to Congress' power to legislate. The government's obligation as expressed in the bond merely provided that "[t]he principal and interest hereof are payable in United States gold coin of the present standard of value." *Perry,* 294 U.S. at 347, 55 S.Ct. at 433; Act of September 24, 1917, ch. 56, 40 Stat. 288 (1917). No words in the bond referred explicitly to the fact that the government had bound Congress' power to alter the terms of the bond in the future.

*See also Lynch,* 292 U.S. at 577–79, 54 S.Ct. at 842–44 (finding that Congress could not abrogate without paying compensation a contract to provide war risk insurance where the statute constituting the contract, Act of October 6, 1917, ch. 105, Sec. 402, 40 Stat. 409 (1917), made no reference to Congress' power to legislate); *United States Trust Co. v. New Jersey,* 431 U.S. at 9–10, 97 S.Ct. at 1511–12 (finding that New Jersey and New York could not abrogate the terms of bonds held by private individuals where the statute defining the terms of the bonds did not mention the power of either state to legislate). To read the unmistakability doctrine as requiring explicit reference to Congress' sovereign power in the contract is to exalt the words of a contract over the substance of an unmistakable bargain struck between the government and its citizens.

### D. *Statutory Delegation and the Unmistakability Doctrine*

In determining whether FHLBB and FSLIC possessed the power to enter into a contract which could "bind" Congress' power to regulate, the court applied its interpretation of the unmistakability doctrine to statutory delegations of power to executive branch agencies. The court ruled that

> [i]n the context of contracts entered into by administrative agencies ... the unmistakability doctrine has two components: the contract relinquishes Congress' power to regulate only when (1) the agency, in the contract, has unmistakably waived Congress' regulatory authority, and *(2) Congress, in a statute, has unmistakably delegated to the agency the power to surrender Congress' regulatory authority.*

*Transohio,* at 621 (emphasis added). The court reasoned that the only alternative to requiring an unmistakable delegation by Congress to agencies concerning Congress' regulatory authority would be "reading broad congressional delegations of power as including the power to preclude future congressional regulatory legislation," an alternative which "would seriously undermine the constitutional scheme of separation of powers." *Id.* at 622. The *Trans-*

*ohio* court conjectured that such broad delegations would erode the separation of powers between the executive and legislative branches because they "would allow federal agencies to supplant congressional policymaking by contracting away Congress' power to legislate." *Id.*

This analysis, however, must be rejected because of its assumption that the acquiring thrifts in these cases claim to have bound Congress' power to regulate. They make no such claim. The acquiring thrifts merely assert that they entered into unmistakable contracts with the government regarding the treatment of supervisory goodwill. As this court ruled in *Winstar II*,

> the government's power to regulate must operate within the context of plaintiffs' contract rights. While Congress clearly may alter the regulatory treatment of supervisory goodwill, it must also honor the plaintiffs' rights. The government may breach the contract, but it must pay for the damages the plaintiffs suffer. Any alteration of this principle would undercut our democratic system. It would allow governmental policies to be paid for with a minority's rights.

*Winstar II*, 25 Cl.Ct. at 549. In extending an unmistakability requirement to the statutory delegation of authority to FHLBB and FSLIC, the *Transohio* analysis creates new law at odds with historic contract interpretation.

FSLIC's clear statutory mandate also belies the conclusion that only explicit delegations surrendering Congress' power to regulate can create real rights. FSLIC was given broad authority *by Congress* to assist and participate in acquisitions of unhealthy or insolvent thrifts by healthy and solvent ones.

> In order to facilitate a merger or consolidation of an insured institution ... with another insured institution or the sale of assets of such insured institution and the assumption of such insured institution's liabilities by another insured institution, [FSLIC] is authorized, *in its sole discretion and upon such terms and conditions as [FSLIC] may prescribe—*
>
> .     .     .     .     .

> (iii) to guarantee such other insured institution ... against loss by reason of such other insured institution's merging or consolidating with or assuming the liabilities and purchasing the assets of such insured institution....

12 U.S.C. § 1729(f)(2)(A) (emphasis added). This statutory delegation, in conjunction with FSLIC's congressionally authorized power to enter contracts, *see* 12 U.S.C. § 1725(c)(3) (FSLIC "shall have power ... to make contracts"), makes it clear that FSLIC possessed the power to enter into binding agreements with acquiring savings and loan institutions. The *Transohio* court's expressed concern that if FSLIC indeed had the authority to enter into contracts with acquiring thrifts that "agencies would be making laws not pursuant to congressional direction, but over Congress' objections" is therefore unpersuasive. It is also a concern that the Congress obviously rejected when it authorized FSLIC to enter into these transactions and execute these contracts. It is hardly the function of courts to provide Congress advice on the political dangers of delegating legal authority to federal agencies. In according FSLIC the authority to contract, Congress made a policy decision to give FSLIC the power to bind the government. FSLIC, therefore, cannot be held to have exceeded its authority because it possessed, by an act of Congress, the power to bind the government and thereby confer vested contractual rights.

Perhaps at the core of this court's difficulty with accepting *Transohio*'s reasoning is that decision's conception of government structure. Congress under our system makes law, it does not deal with an executive agency as if that agency was under its bureaucratic direction. The teaching of *Chadha* makes it clear that the Congress operates only by legislating, not by administering. *See National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*, 470 U.S. 451, 466, 105 S.Ct. 1441, 1451, 84 L.Ed.2d 432 (1985) ("[T]he principal function for the legislature is not to make

contracts, but to make laws that establish the policy of the state.").

Just as agencies cannot be thought of as common law agents of the Congress under our constitutional system, they cannot bind Congress as an agent may sometimes bind its principal. The government is always and continuously bound by the legal effects of all previous legislation as well as the Constitution. The very concept of Congress contracting away some of its sovereign power as the *Transohio* court suggests—"We assume without expressing a view that Congress might, in a contract, surrender aspects of its regulatory authority—though the Supreme Court has recently said that a *state* may not contract away 'essential' attribute[s] of its sovereignty,' *United States Trust Co. v. New Jersey*, 431 U.S. 1, 23, 97 S.Ct. 1505, 1518, 52 L.Ed.2d 92 (1977), and long ago suggested that Congress may not either, *see North Am. Commercial Co. v. United States*, 171 U.S. 110, 137, 18 S.Ct. 817, 828, 43 L.Ed. 98 (1898)," *Transohio* at 621—is so strange precisely because Congress does not act as Congress through contracting. Only in Congress' internal housekeeping does it act by contracting. In this capacity it acts not as one of the branches of the triune sovereign, but as another government agency. Any theory to the contrary diminishes the role of Congress in our government by turning it into a part of the bureaucratic system rather than as the repository of "[a]ll legislative Powers herein granted...." U.S. CONST. art. I, § 1.

### E. *Congressional Policy*

In reaching its conclusion that the agreements between the government and the acquiring thrifts constituted nothing more than gambling transactions, the *Transohio* court invoked as support policy statements criticizing the use of supervisory goodwill made by members of Congress and the Administration. *Transohio*, at 619–20. The government has also invoked such policy statements in arguing that the government cannot be bound by these agreements. This court again seeks to make it clear that *policy considerations have no part* in evaluating whether the acquiring

thrifts possessed contractual rights which must be honored. As this court noted in *Winstar II:*

> The duty of this court, like any other court, is solely limited to determining the respective rights of the particular parties before it and granting relief to the parties where appropriate. It would be highly improper for this court to consider, as the government seems to suggest it do, the effect of this decision on the government's savings and loan policy. Courts are not established to make policy. Our Constitution, and the people who established that great document, gave the policy-making powers to the executive and legislative branches.

*Winstar II*, 25, Cl.Ct. at 550.

### IV. Consolidation and Certification for Interlocutory Appeal

*Winstar* was the first of eighteen cases filed to date in the Claims Court which require a determination of the legal impact of FIRREA on the claimed contract rights of acquiring thrifts. In each of the remaining fifteen cases, the court is called upon to consider, as it has done in *Winstar* and again in the present cases, the nature and effect of pre-FIRREA negotiated agreements between acquiring thrifts and the government. Although some of the remaining cases present issues not addressed in *Winstar*, *Statesman* or *Glendale*, the outcome of all the *Winstar*-related cases will be settled in favor of the government if this court has incorrectly ruled in *Winstar*, *Statesman*, and *Glendale* that (1) the Supreme Court's decision in *POSSE* does not affect the binding nature of the agreements entered into between the government and the acquiring thrifts and (2) FIRREA does not constitute a sovereign act within the meaning of the sovereign acts doctrine.

Based on the fact that this court's conclusions on these two legal issues affect eighteen very large and complex cases, this court raised with the parties in *Winstar*, *Statesman*, and *Glendale* at a status conference on May 4, 1992 the possibility that an interlocutory appeal might be the appropriate means by which potentially to pre-

vent the wasting of considerable resources, not only of the court, but of the parties in those three cases and the remaining fifteen cases before the court. The court suggested that the *Winstar, Statesman,* and *Glendale* cases be the cases taken up on appeal because, considered together, they present a number of different factual variations on the legal issues that must ultimately be decided. In regard to the agreements alleged to constitute a contract, *Statesman* involves an express contract which the government has conceded it entered into (at least in regard to capital credit); *Glendale* involves an express contract which the government does not concede it entered into; and *Winstar* involves an implied-in-fact contract. In regard to the effect of FIRREA on the acquiring thrifts, *Glendale* involves a thrift which, even after FIRREA, is solvent and in operation; *Statesman* involves an insolvent thrift that, but for FIRREA, would be solvent; and *Winstar* involves an insolvent thrift which would still most likely be insolvent even if FIRREA had not been enacted. Further, these are the only three cases which have reached the stage of a final determination of liability.

After resolving the liability stages of *Statesman* and *Glendale* today, the court finds that it is appropriate, and indeed the court's duty, to make it possible for the parties in *Winstar, Statesman,* and *Glendale* to seek an interlocutory appeal before the *United States Court* of Appeals for the Federal Circuit. To that end, the court hereby orders:

(1) *Statesman* and *Glendale* are consolidated with *Winstar Corp. v. United States,* No. 90–8C. The cases will be captioned under the case name *Winstar Corp. v. United States;*

(2) Pursuant to 28 U.S.C. § 1292(b), the court hereby certifies that this court's opinions granting summary judgment as to liability in the consolidated cases *Winstar Corp. v. United States,* No. 90–8C, *Statesman Savings Holding Corp. v. United States,* No. 90–773C, and *Glendale Federal Bank, FSB v. United States,* No. 772C, involve controlling questions of law as to which there is

substantial ground for difference of opinion and that an immediate appeal from these opinions may materially advance the ultimate termination of this and related litigation.

### CONCLUSION

For the reasons set forth above, the court grants Statesman's and Glendale's Motions for Summary Judgment as to Liability. The court also denies the government's pending Motions to Dismiss in both cases. If the parties do not seek an interlocutory appeal, these cases will move forward to determine plaintiffs' injury, if any, and the appropriate measure of damages or manner of restitution.

IT IS SO ORDERED.