**SOUTHERN CALIFORNIA FEDERAL SAVINGS & LOAN ASSOCIATION; So-Cal Holdings, Inc.; Arbur, Inc.; Roy Doumani; Preston Martin; William E. Simon, Jr., J. Peter Simon, George J. Gillespie, III, Executors of the Estate of William E. Simon; and Beverly W. Thrall, Successor to the Claims of Larry B. Thrall, Plaintiffs,**

v.

**The UNITED STATES of America, Defendant.**

No. 93–52C.

United States Court of Federal Claims.

May 10, 2002.

Rosemary Stewart, Spriggs & Hollingsworth, Washington, D.C., attorney of record and argued for plaintiffs Southern California Federal Savings and Loan Association and SoCal Holdings, Inc. Jerry Stouck and Monica A. Freas, of counsel.

Toni C. Lichstein, Milbank, Tweed, Hadley & McCloy, New York City, attorney of record and argued for plaintiffs Arbur, Inc., and William E. Simon, Jr., J. Peter Simon and George Gillespie, III, Executors of the Estate of William E. Simon. David S. Cohen, of counsel.

Melvin C. Garbow, Arnold & Porter, Washington, D.C., attorney of record; David

B. Bergman argued for plaintiffs Roy Doumani, Preston Martin, and Beverly W. Thrall, Successor to the Claims of Larry B. Thrall. Howard N. Cayne, Michael A. Johnson, Ida L. Bostian, of counsel.

David C. Hoffman, Trial Attorney, Commercial Litigation Branch, Department of Justice, Washington, D.C., attorney of record and argued for Defendant. With him on the briefs were Jeanne E. Davidson, Deputy Director, David M. Cohen, Director, and Stuart E. Schiffer, Deputy Assistant Attorney General. Delfa Castillo, Kenneth M. Dintzer, and Tonia J. Tornatore, of counsel.

## OPINION

BASKIR, Chief Judge.

This case is one of more than 120 *Winstar*-related cases arising out of the saving and loan crisis in the 1980's. The history behind the thrift industry's crisis and the subsequent measures taken by the Government to resolve it, have been extensively discussed in the original *Winstar* cases. *See United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (*Winstar IV*), *aff'g*, 64 F.3d 1531 (Fed.Cir.1995) (*en banc*) (*Winstar III*).

Pending before the Court are the Plaintiffs' *Winstar* "Short Form" Motion for Partial Summary Judgment and the Defendant's Cross–Motion for Partial Summary Judgment, both filed in 1997. Despite the Government's dogged advocacy and its insistence on re-litigating issues that were conclusively addressed by Senior Judge Loren A. Smith of the Court of Federal Claims, the Court of Appeals for the Federal Circuit and the Supreme Court, the Court is unpersuaded by the Defendant's arguments and finds that the Government breached the contract it had with the Plaintiffs. Accordingly, we therefore must GRANT the Plaintiffs' Motion for Partial Summary Judgment on Count 1, breach of an express contract. We DENY the Government's cross-motion.

## I. BACKGROUND

### A. The Plaintiffs

This is a suit against the United States by a savings and loan association, its holding company, and the individuals who helped form both institutions. In the mid–1980's, one-hundred-year-old Southern California Savings and Loan Association (Old Southern), based in Beverly Hills, California, was suffering "serious asset problems" from "large operating losses, weak management, poor quality control and underwriting standards, and large contingent liabilities." Joint Status Report, filed Mar. 30, 2001, at p. 2. On June 7, 1985, the Federal Home Loan Bank Board (FHLBB), pursuant to its statutory authority over federally insured institutions, placed the insolvent thrift into receivership under the control of the Federal Savings and Loan Insurance Corporation (FSLIC). For the next year, as an alternative to liquidating the thrift and expending the FSLIC's limited insurance funds, the FHLBB and FSLIC solicited prospective purchasers or merger partners who might rescue the deeply troubled institution.

In response to these solicitations, the late former U.S. Treasury Secretary William E. Simon, Sr., formed a group of investors including, among others, former Federal Reserve Vice–Chairman and former FHLBB Chairman Preston Martin, California real estate investors Roy Doumani and the late Larry B. Thrall, and Arbur, Inc., an investment company owned by Secretary Simon and his children. In late 1986, Secretary Simon's group submitted to the FSLIC a bid to acquire the thrift. The members of Secretary Simon's group are referred to collectively as the "Individual Plaintiffs."

The Individual Plaintiffs proposed to form and capitalize personally a holding company, to be named SoCal Holdings, Inc. (SCH), which would in turn purchase the failing thrift and form a new savings and loan association. Upon Government approval, the new association, named Southern California Federal Savings and Loan Association (SoCal), would acquire all of the assets and liabilities of its predecessor. The group's proposal, of course, contained a business plan which they believed would return SoCal to solvency and, eventually, profitability. Together, SoCal and its holding company are referred to as the "Institutional Plaintiffs."

The Plaintiffs initiated this lawsuit in 1993. Two years later, on August 2, 1995, the Plaintiffs filed a first amended complaint alleging that, by enacting the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA), Pub.L. No. 101–73, 103 Stat. 183, in 1989, the Government breached an express contract (Count 1), an implied-in-fact contract (Count 2), and the duty of good faith (Count 3). The Plaintiffs also seek restitution for breach of the alleged contract (Count 4), and further allege that the Government committed a taking without just compensation (Count 5) and violated the Plaintiffs' due process rights (Count 6).

Since 1995, some of the parties' names have changed. On July 1, 1997, SoCal changed its name to People's Bank of California and SoCal Holdings, Inc. to PBOC Holdings, Inc. Four years later, on November 13, 2001, People's Bank of California merged with California National Bank, with California National Bank the surviving institution. California National Bank is the successor-in-interest to SoCal and, together with PBOC Holdings, Inc., continues to pursue the thrift's claim on behalf of the named plaintiffs, Southern California Federal Savings and Loan Association and SoCal Holdings, Inc. For ease of reference, the parties and the Court continue to refer to the Institutional Plaintiffs as SoCal and SCH.

Upon Mr. Thrall's death in 1998, Beverly W. Thrall, Mr. Thrall's wife, was substituted as a Plaintiff, pursuant to Court of Federal Claims Rule 25(a). Upon Secretary Simon's death in 2000, William E. Simon, Jr., J. Peter Simon, and George Gillespie, III, the Executors of the Estate of William E. Simon, were substituted as Plaintiffs, also pursuant to Rule 25(a).

Several participants to the 1987 transaction are not present in this case. The Ariadne Group filed its own independent complaint on these same facts. Its case was dismissed as untimely under the governing statute of limitations. 28 U.S.C. § 2501 (1994). *See Plaintiffs in Winstar–Related Cases v. United States,* 37 Fed.Cl. 174, 182–84 (1997), *aff'd, Ariadne Fin. Serv. Pty., Ltd. v. United States,* 133 F.3d 874 (Fed.Cir.1998), *cert. denied,* 525 U.S. 823, 119 S.Ct. 67, 142 L.Ed.2d 53 (1998). Its motion to intervene in this case was also denied. *See S. Cal. Fed. Sav. and Loan Assoc. v. United States,* 51 Fed.Cl. 114 (2001) (*Ariadne Intervention Order*). FIMA, another shareholder, apparently did not join in this complaint or file its own.

In addition, two members of Secretary Simon's original group did not join in either the 1993 complaint or the 1995 amended complaint. Mr. Craig Godsen has never sought to be a party to this lawsuit. Another signatory, former assistant Treasury Secretary Gerald Parsky, filed his own independent lawsuit related to the SoCal transaction. Mr. Parsky's complaint was also dismissed on statute of limitations grounds, as was his motion to intervene. *See S. Cal. Fed. Sav. and Loan Assoc. v. United States,* 51 Fed.Cl. 676 (2002) (*Parsky Recons. Order*); 52 Fed. Cl. 444 (2002) (*Parsky Intervention Order*).

## B. The Acquisition and Conversion of SoCal

The Individual Plaintiffs' bid proposal regarding Old Southern was conditioned upon the receipt of substantial direct financial assistance from the Government and certain regulatory forbearances regarding minimum capital requirements. Capital requirements are "minimum reserves"—computed as a percentage of total liabilities—that the Government requires a savings and loan to maintain. *Winstar III,* 64 F.3d at 1535. The failure to "comply with minimum regulatory capital requirements [has] severe repercussions for a thrift." *Id.* As then-Chairman of the U.S. Securities and Exchange Commission Richard C. Breeden noted in 1991:

> Capital requirements are the most powerful source of discipline for financial institutions. When maintained at an appropriate level, capital requirements reduce the incentive to take excessive risks and provide a cushion against loss.

Richard C. Breeden, "Thumbs on the Scale: The Role That Accounting Practices Played in the Savings and Loan Crisis," 59 *Fordham L.Rev.* S71, S75 (1991), *cited with approval in Winstar IV,* 518 U.S. at 845–851, 116 S.Ct. 2432.

The bid also specifically proposed that the newly formed institution would account for the transaction "under purchase accounting" and that:

> any excess of fair value of liabilities over the fair value of assets would be recorded as an intangible asset ("goodwill") which would be amortized over 25 years using the straight-line method, without adjustment for any reason.

Bid Proposal, at p. 8–9.

The purchase method of accounting is a generally accepted accounting practice (GAAP) for mergers. *See Winstar III*, 64 F.3d at 1535.

In January, 1987, the FSLIC accepted the Individual Plaintiffs' bid in principle and thereafter a series of exchanges took place to complete the deal. Although the dollar amount of the Government's direct cash contribution changed several times, the essential form of the transaction—a supervisory conversion using the purchase method of accounting and the infusion of cash from both the Government and several private parties—remained constant.

This transaction was executed on April 30, 1987, and was embodied in a series of several inter-related documents signed by various of the parties, including the FSLIC, FHLBB, SoCal, SCH, and the Individual Plaintiffs. These documents include:

> (1) Assistance Agreement (AA), signed by FSLIC, SoCal, SCH;
>
> (2) Regulatory Capital Maintenance Agreement (RCMA), signed by FSLIC, SoCal, SCH, and each Individual Plaintiff;
>
> (3) FHLBB Resolution No. 87–511, reciting the particulars of the transaction; approving the supervisory conversion from a mutual to a stock association; approving the use of the capital credit in meeting regulatory minimum requirements; and approving the use of the purchase method of accounting with a twenty-five year amortization period;
>
> (4) FHLBB Implementation Resolution No. 87–513, approving the FSLIC's expenditure of money to the new association; and

(5) Forbearance Letter from FHLBB to SCH (dated May 27, 1987), approving the use of the purchase method of accounting and the use of the FSLIC cash contribution towards meeting the regulatory capital requirements.

The Assistance Agreement contained the following integration clause:

> This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only any resolutions or letters concerning the Conversion, the Acquisition or this Agreement issued by the Bank Board or the [FSLIC] in connection with the approval of the Conversion, the Acquisition, and this Agreement.

Assistance Agreement, sec. 18(a).

There is no disagreement among the parties that the documents referred to in the integration clause included, at a minimum, FHLBB Resolutions 87–511 and 87–513, and the FHLBB Forbearance Letter to SCH.

Together, these documents recited the following cash components of this complex transaction. First, the Individual Plaintiffs arranged for the infusion of approximately $40 million in private funds into SoCal and SCH. Second, after the FSLIC converted SoCal from a mutual savings and loan association to a stock savings and loan association, the new holding company purchased all of SoCal's common stock. Third, the FSLIC made a direct cash contribution to SoCal in the amount of $217.5 million, known throughout the *Winstar* litigation as the FSLIC "capital credit."

The private funds originated from a variety of sources. Two investment companies, Alapim Holdings, B.V., a Netherlands corporation (whose successors-in-interest are Ariadne Financial Services Partnership, Ltd. and Memvale Partnership, Ltd., collectively referred to as the "Ariadne Group") and FIMA Finance Management, Inc. (FIMA), purchased 100,000 shares of SoCal preferred stock for $33.3 million and 100,000 shares of SCH preferred stock for $1.7 million. The

Ariadne Group also loaned the individual members of Secretary Simon's group a total of $5.8 million. The Individual Plaintiffs then used most of those funds ($5.1 million) to capitalize the holding company. In return, the Individual Plaintiffs received differing amounts of SCH common stock.

The primary Government documents approving the merger, FHLBB Resolution 87–511 and the FHLBB Forbearance Letter, required SoCal to submit to the FSLIC professional opinion letters regarding the transaction. First, SCH and the Individual Plaintiffs, no later than thirty days after the close of the transaction, were required to submit an opinion of counsel letter stating, among other required items, that the AA and the RCMA "constitute valid and binding obligations" upon SoCal, SCH and the Individual Plaintiffs. Res. 87–511, paras. 12–13. Second, SoCal and SCH were required to submit an "analysis accompanied by a concurring opinion from independent public accountants" verifying that SoCal accounted for the transaction under GAAP, except where the FHLBB and the FSLIC granted SoCal exceptions from compliance with GAAP. Res. 87–511, p. 13; Forbearance Letter, para. 2. The parties all agree that these documents were submitted in accordance with the conditions set forth in the FHLBB Resolution and Forbearance Letter.

The transactional records also contained several crucial mutual promises running between various of the parties. First, the RCMA, which was signed by the FSLIC, SoCal, SCH, Arbur, in their corporate capacities, and Messrs. Doumani, Martin, Simon, and Thrall, in their individual capacities, contained a personal guarantee from each of the Individual Plaintiffs to infuse up to an additional five million dollars into SoCal should its capital fall below a certain level. RCMA, sec. 4.

Second, the RCMA specifically stated that SoCal could credit the $217.5 million Government capital contribution towards its regulatory net worth account. RCMA, sec. 1; Res. 87–511, para. 21(b); Forbearance Letter, para. 2(a).

Third, as proposed, SoCal could account for the acquisition using the purchase method of accounting, which brings about the recognition of goodwill for accounting purposes. AA, sec. 13; Res. 87–511, para. 21(a); Forbearance Letter, para. 2(b). Because the FSLIC supervised all transactions at issue in these *Winstar* cases, this goodwill has become known as "supervisory goodwill." On April 30, 1987, SoCal booked approximately $79 million in supervisory goodwill.

Fourth, FHLBB approved SoCal's request that the supervisory goodwill could be amortized over twenty-five years using the straight line method. Res. 87–511, para. 21(c); Forbearance Letter, para. 2(b).

Fifth, the RCMA also contained a clause that if the regulatory capital fell below three percent of SoCal's liabilities, the FSLIC could repossess the institution. RCMA, sec. 7. This provision of the RCMA, along with the Individual Plaintiffs' personal cash guarantee, is key to understanding the deal. The Government specifically required the Individual Plaintiffs to sign and execute the RCMA before it would "provide [the] financial assistance and indemnification[s] set forth in the Assistance Agreement." RCMA, Recital "E", p. 2. The personal guarantees represented by their individual signatures provided extra security to the Government that the members of Secretary Simon's investment group would not walk away from the ailing thrift. This document imposed obligations on the private signatories for up to twelve years.

Taken together, the intangible goodwill promise and the tangible capital credit represented almost $300 million of Government assistance, direct and indirect, in exchange for the Individual Plaintiffs' time, leadership, and money in rescuing the failing thrift. The cost to the Government to liquidate the thrift and close it down was estimated at that time at $235 million. As the Government document approving the acquisition stated, the FSLIC's expenditure of over two hundred million dollars, the use of goodwill, and "the acquisition of SoCal by SoCal Holdings ... lessen[ed] the risk to the FSLIC." Res. 87–511, Marketing and Acquisition Finding No. 6, p. 17.

The Plaintiffs contend that all of these documents considered together constitute a "Final Contract," integrating the whole transaction, and creating mutually supporting obligations between the Government and the Plaintiffs.

## C. FIRREA

FIRREA became law in 1989. Either directly or by mandatory regulations, it established strict new statutory capital standards for savings and loan associations, abolished both the FHLBB and the FSLIC, transferring their authority to the newly created Office of Thrift Supervision (OTS), and altered a number of existing regulations under which the SoCal supervisory conversion had occurred.

For the Plaintiffs, the most important provision of the new law related to the permissible regulatory treatment of supervisory goodwill and capital credit. Under FIRREA, "Congress expressly restricted the continued use of supervisory goodwill to satisfy regulatory capital requirements." *Winstar III*, 64 F.3d at 1538. FIRREA established three new minimum capital standards: "tangible" capital, "core" capital, and "risk-based" capital. 12 U.S.C. § 1464(t). After FIRREA's enactment, goodwill "could not be included at all in satisfying [the new] minimum *tangible* capital" requirements and only a certain amount of goodwill was permitted to be counted towards the new minimum core capital requirements. *Winstar III*, 64 F.3d at 1538 (emphasis added). The amount of goodwill includable in the core capital requirements was phased out entirely on December 31, 1994. *Id.* Further, the amortization period for goodwill was limited to twenty years. 12 U.S.C. § 1464(t)(9)(B).

While FIRREA did not specifically address capital credits, the OTS, by regulation, equated capital credits with supervisory goodwill and phased out the Plaintiffs' ability to use them in the same manner. 12 C.F.R. 567.1(w); *Winstar III*, 64 F.3d at 1538. Thus, SoCal could no longer count the $217.5 million cash contribution by the United States towards minimum capital requirements.

Prior to the effective date of FIRREA, SoCal's regulatory capital, which included both the large FSLIC capital credit and the supervisory goodwill, was well in excess of the minimum requirements. After FIRREA and its regulations, however, OTS notified SoCal that it was a "troubled association" because it had a "substantial capital deficiency under the tangible capital requirements." Letter from Sidney C. Mar, OTS Supervisory Agent, to SoCal Board of Directors, dated Aug. 30, 1989. As a result of that deficiency, OTS imposed severe operating restrictions upon SoCal. Thereafter, SCH was forced to raise capital from outside investors in four separate rounds of financing in order for SoCal to remain solvent.

## II. PROCEDURAL POSTURE

### A. *Winstar* Trilogy

This case, along with other *Winstar* cases, was stayed for several years to allow three test cases—*Winstar Corp., et al. v. United States* (90–8C), *Glendale Federal Bank, FSB v. United States* (90–772C), and *Statesman Savings Holding Corp., et al. v. United States* (90–773C)—to complete their way through the Court of Federal Claims, the Federal Circuit and the Supreme Court. In each of these three cases, the Court of Federal Claims found that a contract existed and that the Government's enactment of FIRREA breached those contracts. *See Winstar Corp. v. United States,* 21 Cl.Ct. 112 (1990) (finding an implied-in-fact contract but requesting further briefing on contract issues) (*Winstar I*); 25 Cl.Ct. 541 (1992) (finding contract breached and entering summary judgment on liability) (*Winstar II*); *Statesman Sav. Holding Corp. and Glendale Fed. Bank v. United States,* 26 Cl.Ct. 904 (1992) (finding an express contract and granting summary judgment on liability to Statesman and Glendale) *(Statesman).*

The cases were consolidated for appellate review. After an initial split panel decision of the Federal Circuit reversed the Court of Federal Claims decisions, the Federal Circuit reconsidered the three cases *en banc* and affirmed the trial court decisions. *See Winstar III,* 64 F.3d 1531 (Fed.Cir.1995) (concurring with Judge Smith's holding in each case,

holding that the parties formed an express contract and that the Government breached that contract when it enacted FIRREA).

The Supreme Court in turn affirmed the Federal Circuit in a plurality opinion. *See Winstar IV,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Justice Souter wrote the "Principal Opinion," and was joined by Justices Stevens, O'Connor and Breyer, who also wrote a separate concurring opinion. Justice Scalia agreed with the Principal Opinion's contract formation and breach holdings, but also wrote separately in concurrence to address his reasons for rejecting the Government's "unmistakability" and "sovereign acts" defenses. Justices Kennedy and Thomas joined Justice Scalia's concurrence. Chief Justice Rehnquist, joined by Justice Ginsburg, dissented, but focused only upon the Principal Opinion's treatment of the Government's sovereign defenses, not on the issues of contract formation and textual interpretation or breach. Thus, seven Justices concurred in the judgment affirming the Federal Circuit.

**B.  Case Management Process**

After the Supreme Court issued its decision in July, 1996, this Court, under the leadership of then-Chief Judge Loren A. Smith, devised a plan to handle the approximately 120 related cases. Pursuant to the Omnibus Case Management Order, filed on September 18, 1996, and two procedural orders filed on August 11, 1997, all of the cases were re-assigned to Judge Smith's docket, as *Winstar* Managing Judge, and were divided into several groups for discovery and trial scheduling purposes.

The process also established what was designed to be an expedited method for resolving liability issues. The plaintiffs in all *Winstar* cases were permitted to file "Short Form" Motions for Partial Summary Judgment addressing two key legal issues— whether there was a *Winstar*-type contract, and whether FIRREA breached that contract. The Government was given an extended period to respond—sixty days to file a response to formation and breach issues, and one hundred twenty days to raise any defenses.

Because the Government was unwilling to stipulate on the contract formation or liability questions, the Plaintiffs, through a specially created "Coordinating Committee," proposed that the Court consider several recurring issues and the Government's various defenses in one proceeding. Over the Government's objection, Judge Smith agreed and after selecting four sample cases, he ordered extensive briefing and extended oral argument on twelve issues common to the sample cases. *See California Federal Bank, FSB v. United States; Landmark Land Co. v. United States; LaSalle Talman Bank, FSB v. United States; C. Robert Suess v. United States,* 39 Fed.Cl. 753, 754–55 (1997) (*Cal Fed I* ). The purpose of the "Common Issue Process" was to "*identify and resolve* issues common to many cases." *Id.* at 756 (emphasis added).

Judge Smith issued his opinion on eleven of the twelve common issues on December 22, 1997, and at the conclusion of that opinion, issued the following Show Cause Order. In it, he chastised the Government in unusually strong language for re-litigating issues already determined on appeal, a failing we find repeated in this case as well.

## CONCLUSION

Defendant's arguments on the eleven Common Issues Nos. 1–10 and 12 range from the rejected to the implausible. This is especially so since the arguments are heavily legal, and the government persists in ignoring or misrepresenting the law while failing to distinguish the cases factually. Summary judgment on these Common Issues is thus appropriately granted to Plaintiffs.

## THE COURT THUS ORDERS THE FOLLOWING:

In all *Winstar*-related cases where there are pending summary judgment motions or cross-motions filed by the plaintiffs, the United States shall show cause, within 60 days, why those motions should not be granted, and liability found on all *Winstar* contract issues based upon the instant decision. In all cases where the government

has a pending summary judgment motion or cross-motion the government shall show cause within 60 days, why those motions should not be denied, for the same reasons.

Following the submission of any summary judgment motion on liability in any *Winstar*-related case the United States shall have 90 days to show cause why that motion should not be granted on the same basis.

The government in responding to this order shall not raise issues that have been resolved by opinions in the original *Winstar* cases as clarified in this decision. Irrespective of ultimate attorneys fee issues in these cases, failure to follow this order will require the government to reimburse the plaintiffs for attorneys fees spent litigating issues that have already been resolved by this court, the Federal Circuit or the Supreme Court.

*Id.* at 779.

The Federal Circuit affirmed Judge Smith's determination of the Government's liability, but reversed and remanded for further consideration of the damages issues. *See Cal. Fed. Bank v. United States,* 245 F.3d 1342 (Fed.Cir.2001) (finding an express contract was formed, and that FIRREA breached that contract, despite the absence of a *Winstar*-type Assistance Agreement with a specific integration clause) (*Cal Fed II* ), *cert. denied,* —— U.S. ——, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002).

## C. Common Issue Process and Show Cause Order

The essential purpose of the Common Issue Process and then the Show Cause Order was to force the Government to concede liability in cases where their defenses to contract formation and breach were foreclosed by binding opinions of higher courts, or to show the Court how an individual case was different from the test pattern on which liability was found.

Unfortunately, this procedure did not produce the result the Court intended. Because of the Government's objection to the Common Issue Process approach, the case that addressed the dozen Plaintiff-designated issues was not styled as were other *Winstar*

proceedings—as a universal, all *Winstar*-related case proceeding. *See, e.g., Plaintiffs in Winstar–Related Cases v. United States,* 37 Fed.Cl. 174, 179 (1997) (discussing statute of limitations issues in all *Winstar* cases) and *Plaintiffs in All Winstar–Related Cases At the Court v. United States,* 44 Fed.Cl. 3 (1999) (discussing the issue of the FDIC's intervention in *Winstar* cases). Because the *Cal Fed I* decision was limited to *Cal Fed* facts, the common issue findings in the opinion were not adopted to each of the other *Winstar* cases on Judge Smith's docket. *See Cal Fed. I,* 39 Fed.Cl. at 779. By contrast, the Show Cause Order, founded on *Cal Fed* results, was specifically directed to every *Winstar* case at the Court of Federal Claims.

The Defendant filed its Response to the Show Cause Order as respects this case on February 20, 1998, and the Plaintiffs filed a Proposed Order for Partial Summary Judgment on Liability on March 31, 1998. Judge Smith did not render a decision on the Defendant's Response to the Show Cause Order in this case, nor did he act upon the Plaintiffs' Proposed Order. Once fact and expert discovery was complete in June, 2000, the Response to the Show Cause Order, along with other pending issues, was transferred to this Court in November, 2000.

The Government's Response objected to the adoption of the Show Cause process, stating that it believed that "[the Show Cause Order] unjustifiably reverses the burden of proof" in this case. Def. Resp. to Show Cause Order, filed Feb. 20, 1998, at p. 31. Accordingly, we will not issue a final ruling on Judge Smith's Show Cause Order. We will instead base our decision upon the Briefs and Oral Arguments supporting Plaintiffs' underlying motion for summary judgment and the Defendant's cross-motion.

## D. Issues to be Decided

The Court must resolve three issues: First, whether the five documents we have cited constitute one contract and whether the Individual Plaintiffs were parties to this overall agreement; Second, whether the transactional documents created a contract with the Plaintiffs concerning SoCal's ability

to count the $217.5 million capital credit and the $79 million in supervisory goodwill towards the thrift's regulatory capital requirements; and finally, if we determine that a contract existed with promises involving capital credits and supervisory goodwill, whether FIRREA breached that contract and those promises. Before we turn to a consideration of these questions, we will first review the legal context in which they are presented.

## III. *WINSTAR* PRECEDENTS

While the undecided liability issues in this *Winstar* case are not new, they are before the undersigned judge for the first time. Accordingly, we find it helpful to set out a brief history of the *Winstar* precedents that, of course, are binding on this Court.

The parties agree that the transaction that is most like the one at issue here is the transaction that was presented in the *Statesman* case, 26 Cl.Ct. at 904. In 1988, Statesman Savings Holding Corporation (Statesman) acquired four insolvent savings and loans in a supervisory conversion. As a part of the deal, the FSLIC provided Statesman with a cash contribution—a capital credit— of $60 million. *Id.* at 907–08. Further, Statesman was permitted to account for the acquisition using the purchase method of accounting, which created approximately $25.8 million in goodwill. *Id.* Statesman was allowed to amortize the supervisory goodwill over a twenty-five year period. The terms of the agreement between Statesman and the Government were memorialized in an Assistance Agreement, with a clause integrating a Regulatory Capital Maintenance Agreement and several FHLBB resolutions and letters. *Id.*

The Court of Federal Claims held that these documents constituted one over-arching contract between the thrift, its investors, and the United States. *Id.* at 912. It further concluded that FIRREA breached the express contract the Government had with Statesman and that "the government is liable to Statesman for its decision not to honor either of these promises." *Id.* at 916. As noted, the Federal Circuit and the Supreme Court affirmed Judge Smith's contract formation and liability conclusions. *See Wins-*

*tar III,* 64 F.3d at 1541–43; *Winstar IV,* 518 U.S. at 867, 116 S.Ct. 2432.

In resolving the various liability issues in our case, we are guided first by the precedential force of the *Winstar* cases. Textual interpretations of the documents in these cases would control our own interpretations of the documents in this case unless, of course, textual differences or underlying factual differences dictate a different legal conclusion. Moreover, the analyses and conclusions of our colleagues in other *Winstar* decisions offer helpful guides to our own analysis and conclusions. We do not write on a clean slate nor, to shift metaphors, are we compelled to cut a new path through an uncharted *Winstar* wilderness.

Although we are not implementing Senior Judge Smith's Show Cause procedure, and we do not shift any burdens of persuasion, as a practical matter it behooves the Government to show us how the specific facts and texts in this case are so different as to compel a different result than was reached by the Supreme Court and the Federal Circuit.

As my fellow Judge Eric G. Bruggink stated in another *Winstar* opinion on liability:

> We cannot ignore the fact that the contractual provisions we are called upon to interpret here are remarkably similar to provisions considered in *Winstar.* We are not, therefore, interpreting the words of this contract in a vacuum. Consequently, we find it useful to set out, in table format, the relevant contractual language in these transactions alongside the corresponding language in the documentation of the various transactions at issue in *Winstar.*

*Home Sav. of Am. v. United States,* 50 Fed. Cl. 427, 435 (2001).

We think the Judge has the right approach. We will look, therefore, for textual or factual differences, or legal issues not previously decided in determining the liability question in this case.

To aid in this analysis, we asked the parties to submit as a joint appendix those contractual documents in *Statesman* which formed the foundation for the higher court's legal conclusion. The relevant provisions from the *Statesman* documents, compared to

the equivalent provisions in the SoCal documents, are contained in an Appendix to this Opinion. A careful reading of Comparison Charts I—VII reveals that the provisions in the two sets of documents are not materially different from each other in any respect. Further, it is interesting to note that the *Statesman* documents, from March 1988, are one year older than the SoCal documents, from April 1987.

## IV. DISCUSSION

Pursuant to the *Winstar* case management process, Plaintiffs filed a Short Form Motion for Summary Judgment, but did not file proposed findings of fact. However, from the parties' motions, cross-motions, and briefs, it is clear that the relevant documents and facts are undisputed. Furthermore, the Government concedes that it had an express contract with the institutional Plaintiffs, SoCal and SCH, and that, at least with respect to the FSLIC capital credit, FIRREA breached that contract. What remains in dispute is whether the Individual Plaintiffs were parties to that contract, and whether the Government breached that contract with respect to supervisory goodwill. Because the relevant facts are not in dispute, the issues presented here are appropriate for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Before we turn to the merits of the Plaintiffs' motion, however, the Court must note a procedural technicality. The Short Form Motion was made only on behalf of two of the Plaintiffs, SoCal and SCH. The Individual Plaintiffs (represented by different counsel from the Institutional Plaintiffs) did not join in the motion or file their own. The Defendant's response papers, however, assume that all the Plaintiffs joined in the motion. Indeed, in the four years since the Short Form Motion was first filed, the parties have acted as if each Plaintiff had moved for summary judgment.

This oversight was corrected at oral argument, when counsel for Plaintiffs Arbur, Inc., the Executors of Secretary Simon's estate, Mr. Doumani, and Mrs. Thrall moved the Court for permission to join in the original motion. The Government did not object and thus the Court, on November 20, 2001, deemed the Short Form Motion for Partial Summary Judgment to have been joined and filed by all the Plaintiffs.

### A. Sole Benefit Clause

The first issues to be resolved are whether the five documents we have cited constitute one contract and whether the Individual Plaintiffs were parties to this overall agreement. A number of independent analyses compel us to conclude both issues in favor of the Plaintiffs.

The Assistance Agreement, to which only SoCal, SCH, and FSLIC were signatories, contains a clause which the Government argues limits the benefits of that agreement to only the Institutional Plaintiffs. The Individual Plaintiffs, meanwhile, argue that not only did they sign one of the other transaction documents, the Regulatory Capital Maintenance Agreement, but that the Assistance Agreement and the FHLBB implementing resolutions specifically required each of those other documents to be signed in order to complete the transaction. Thus, they conclude that notwithstanding the apparent limiting reach of the "sole benefit" clause, there is one contract and they are parties to it.

██ The Government's argument is incorrect, both as a textual matter and by precedent. First, we apply the traditional maxim that all provisions in a contract must be read so as to give meaning to each, if at all possible. *See, e.g., Brinderson–Newberg Joint Venture v. Pacific Erectors*, 971 F.2d 272 (9th Cir.1992) ("It is a cardinal rule in interpretation of contracts that the contract is to be taken by its four corners and so construed as to give effect to every part of it, *if possible.*") (citations omitted) (emphasis added). The Government's interpretation violates this maxim, creating a conflict with another provision of the document. But Section 21, the "sole benefit" clause, Appendix Comparison III, does state that the Agreement is for the "sole benefit of the parties hereto and for the benefit of no other person." Section 18 of the Agreement, the "entire agreement" clause, Appendix Compari-

son II, specifically adopts each of the other documents and agreements executed contemporaneously with the Assistance Agreement as part of the overall contract between the parties, including the RCMA. In fact, the very validity of the Assistance Agreement was conditioned upon the Individual Plaintiffs' execution of the RCMA:

> The [FSLIC]'s obligations pursuant to this Agreement are also conditioned upon the following: ... The execution and delivery by [SCH], [SoCal], and the Investors [each Individual Plaintiff and Messrs. Godsen and Parsky, but not the Ariadne Group or FIMA], as appropriate, of the Regulatory Capital Maintenance Agreement....

Assistance Agreement, sec. 2(b).

The Federal Home Loan Bank Board also explicitly conditioned its approval of the transaction on the execution of the RCMA by the FSLIC, SCH, SoCal, and the Individual Plaintiffs. Res. 87–511, p. 7, proviso 4. Thus, Secretary Simon and his fellow signatories' roles were not ancillary, as the Government urges, but rather central to this transaction. The thrift would have failed—and the acquisition never have occurred—but for the Individual Plaintiffs.

Furthermore, the "entire agreement" clause also states: "If any provision of this Agreement is invalid or unenforceable, all of the remaining provisions of this Agreement shall nevertheless remain in full force and effect...." AA, sec. 18. The "sole benefit" clause, to the extent that the Government is attempting to use it to limit its liability to the Individual Plaintiffs, would be one such unenforceable provision.

We conclude that the Government, in signing the Assistance Agreement, the RCMA, and the FHLBB implementing resolutions, with all the parties on the same day, intended to contract with all the Plaintiffs—the Institutional Plaintiffs and the Individual Plaintiffs.

Our conclusion is not a new one. The integration clause at issue here is not materially different from the one in *Statesman.* In that case, Judge Smith held that that integration clause "specified the documents that would control the interpretation of the par-

ties' agreement." *Statesman,* 26 Cl.Ct. at 908. Judge Smith concluded that those documents included the Assistance Agreement, the RCMA, the FHLBB Resolutions, and the FHLBB Forbearance Letter. *Id.* The Federal Circuit endorsed Judge Smith's finding that the integration clause "incorporated [the] contemporaneous resolutions of the Bank Board." *Winstar III,* 64 F.3d at 1543. The Principal Opinion of the Supreme Court agreed with that conclusion, stating:

> To the extent that the integration clause leaves any ambiguity, the other courts that construed the documents found that the realities of the transaction favored reading those documents as contractual commitments, not mere statements of policy ... and we see no reason to disagree.

*Winstar IV,* 518 U.S. at 863, 116 S.Ct. 2432. We also see no reason to disagree.

Indeed, the Government initially acknowledged that these transactional documents created one overall contract. Their response and cross-motion refers to the documents signed by the parties as one agreement:

> On or about April 30, 1987, SCH acquired SoCal pursuant to certain agreements by and between SCH, the [FSLIC], and the [FHLBB]. These agreements are embodied in an Assistance Agreement, Regulatory Capital Maintenance Agreement, FHLBB Resolution No. 87–511, and a FHLBB Forbearance Letter (collectively, the "Agreement").

Def. Resp., filed June 13, 1997, p. 3 (citations omitted).

In that same document, the Government, in a title to the section where it concedes breaching the capital credit promise, states:

> There is no dispute that a contract exists between Plaintiffs and the Government concerning the capital credit and that FIRREA is inconsistent with the terms of that contract.

*Id.* at p. 11.

In that first written response to the Plaintiffs' motion, the Government did not challenge the Individual Plaintiffs' contractual status. A month and a half later, however, in the Defendant's 120–Day Response to Plaintiff's Motion for Partial Summary Judgment,

the Government did assert that the Individual Plaintiffs "may not properly assert breach of contract claims against the Government under the Assistance Agreement because plaintiffs lack privity of contract with the Government." Def. 120–Day Resp., filed Aug. 1, 1997, at p. 17. The narrow language of that standing challenge, though, is confined only to the promises contained in the Assistance Agreement. The Government never challenged the Individual Plaintiffs' standing to sue under the Regulatory Capital Maintenance Agreement, to which the FSLIC, SCH, SoCal, and the Individual Plaintiffs are all signatories.

And, as noted above, Section 1 of the RCMA contains an explicit promise that SoCal could use the FSLIC capital credit towards meeting minimum capital requirements. The Government concedes that the RCMA contained this promise. Accordingly, from the four corners of the Government's written responses, then, it appears that they have indeed conceded that a contract does exist between the Government and each of the Plaintiffs with respect to the capital credit.

At oral argument, however, counsel for the Defendant seemed to assert the exact opposite, stating:

> The shareholder Plaintiffs have continued to maintain that we conceded an issue with respect to capital credit with respect to all parties, and it's very obvious from the pleadings that we did not, that we conceded that only with respect to the thrift.

Oral Argument Tr., Nov. 20, 2001, at p. 8.

The Government argued that the "sole benefit" clause limited the contract to the Institutional Plaintiffs only, notwithstanding the Individual Plaintiffs' obvious participation in the execution of the RCMA. Essentially, it now argues that its written concession is only to some of the RCMA's signatories, not all of them. At oral argument, counsel for the Government contended that despite the fact that each Individual Plaintiff signed the RCMA in their individual capacity, because they did not also sign the AA, no contract was formed with them.

The Government's concession that an overall contract was created consisting of a number of separate instruments, cannot co-exist with its narrowly crafted challenge to the Individual Plaintiffs' standing as respects one of those instruments. The Government cannot agree that a contract exists and that FIRREA breached that contract with respect to some of the signatory parties, and at the same time deny that that same contract exists with other of the parties in order to avoid a finding of breach with respect to those latter parties.

Moreover, the Court considers the Government's use of the "sole benefit" clause defense, and its change of position at oral argument that a previously filed, written concession was not really one after all, both to be out of order. These issues have been pending for nine years, and have generated a considerable number of substantive filings. While we recognize that current Government counsel did not represent the Defendant when the Response briefs were originally filed, the Court believes that the Department of Justice's change of position on this issue, *with no notice to the Plaintiffs or the Court,* was procedurally improper and unfair. Such "gotcha" tactics are wholly inappropriate.

Thus, the Government's argument—that this was not an integrated agreement that included the Individual Plaintiffs—is rejected. The Court finds that the Government was a party to an express contract with SoCal, SCH, and the Individual Plaintiffs. We shall refer to this agreement as the "Overall Contract."

### B. Capital Credit

As we have stated, the Government concedes that the transactional documents created an express contract with SoCal concerning its ability to count the $217.5 million FSL1C capital credit towards the thrift's regulatory capital requirements, and that FIRREA breached that promise. The Defendant's capital credit concession represents a refreshing display of legal reality that has not been typical of the Department of Justice's litigation position in these *Winstar* cases

since the Supreme Court issued its opinion in 1996.

Because the Court today finds that the Individual Plaintiffs were parties to the Overall Contract for SoCal's conversion, the capital credit promise runs to them as well. Thus, we must also hold that FIRREA breached the capital credit promise made to the Individual Plaintiffs. Accordingly, the Plaintiffs' motion for partial summary judgment is GRANTED as to this breach.

## C. Supervisory Goodwill

■ The only remaining liability question before the Court is whether the Government breached the Overall Contract with respect to supervisory goodwill. The Government conceded during oral argument that the contractual language reciting the use of the purchase method of accounting and its twenty-five year amortization period constitutes a binding promise. However, the Government asserts three defenses to the breach: First, that the documents do not contain an explicit promise to count the supervisory goodwill towards regulatory capital; second, that the Plaintiffs bore the risk of change in an uncertain regulatory environment; and third, that because SoCal did not need the supervisory goodwill to keep it solvent, it was not a part of the contract. To *Winstar* cognoscenti, these arguments are *deja vu* all over again.

### i. Missing Promise Theory

The Defendant's missing or second promise theory has been considered and rejected by every court that has considered it, including a majority of the Supreme Court. Undeterred, the Government raises it again here. This defense theory was foreclosed by clear precedent—precedent that was issued in 1995 and 1996. Thus, we were more than a little distressed to see the "missing promise" argument re-emerge in our case. In its 120–Day Response, filed in August of 1997, the Government raised the very same argument that a majority of the Supreme Court had plainly rejected one year earlier: "No implied contractual promise to count supervisory goodwill towards regulatory capital was created by the SoCal transaction." Def. 120–Day Resp., at p. 5. Further, at oral argu-

ment, counsel for the Defendant stated: "We never made a promise that it [supervisory goodwill] would be counted as regulatory capital or even capital." Oral Argument Tr., at p. 36.

Whether the Department of Justice believes it or not, the Supreme Court's *Winstar* trilogy is controlling legal authority and binding upon this Court. The Government has not addressed this precedent, nor attempted to explain why it does not preclude its re-assertion in this case.

In any event, in support of this defense, the Government again points to the text of the Overall Contract and notes that the documents do not explicitly state that the thrift can use supervisory goodwill towards meeting the regulatory capital minimums.

In the first *Winstar* case, Judge Smith rejected that theory, holding instead that the documents clearly showed that the Government "expressly intended to contract for the particular treatment of goodwill at issue in this case" and that that contract allowed the thrift to count supervisory goodwill towards regulatory capital minimums. *Winstar I*, 21 Cl.Ct. at 115. The Federal Circuit concurred with Judge Smith's holding, stating:

> If the parties did not intend to use supervisory goodwill for regulatory capital purposes these would simply be no reason for the extensive negotiations and the conditions regarding its use.

*Winstar III*, 64 F.3d at 1542.

Not content with the rejection of their "missing promise" argument in the lower courts, the Government, upon appeal to the Supreme Court, continued to argue that because some necessary language was missing from the documents, the Government had made no such promise. In its Brief to the Supreme Court, the Government wrote:

> The contract provisions on which the Federal Circuit relied in this case do not in fact contain promises that respondents' goodwill will continue to be counted for purposes of satisfying federal regulatory capital requirements ... the relevant portions of those documents [the Assistance Agreements and FHLBB resolutions and forbearance letters] contain directives as to

what respondents must do to comply with current regulatory policy, not commitments by the government to continue to permit goodwill to be counted as capital. *Winstar IV*, Br. for the Pet'r, 1996 WL 99716, at p. 11.

The Principal Opinion explictly rejected this argument, stating:

> The Government ... insists ... that these [merger] documents simply reflect statements of then-current federal regulatory policy, rather than contractual undertakings. Neither the Court of Federal Claims nor the Federal Circuit so read the record, however, and we agree with those courts that the Government's interpretation of the relevant documents is fundamentally implausible.

*Winstar IV*, 518 U.S. at 862, 116 S.Ct. 2432.

These courts held that an explicit second promise is not necessary because of the inclusion of the specific section of the Insurance Regulations in effect at that time, § 561.13, which permitted thrifts to use any asset (tangible or intangible) in computing regulatory capital. Thus, the second promise—using goodwill towards regulatory capital—is subsumed in the first promise—using the purchase method of accounting and a longer amortization period. That same provision is present in our Overall Contract. AA, sec. 13; Res. 87–511, paras. 21(a-c); Forbearance Letter, para. 2(b). As counsel for the Institutional Plaintiffs noted at oral argument, the Government "wants two things: a belt and suspenders." As a majority of the Supreme Court has said, a second such promise (or bracing device) is not necessary to hold that a contract was formed. *See Winstar IV*, 518 U.S. at 862–63, 116 S.Ct. 2432; 867–69. Thus, as previous Courts have done, we too reject the Government's "missing promise" argument.

#### ii. Assumption of the Risk

■ As its second defense, the Government argues that the private parties to the contract assumed the risk of a regulatory change in the treatment of capital. Once again, the Government advances an argument explicitly considered and rejected by the appellate courts, and does so without addressing—much less distinguishing—the applicable precedent. We devote more space in rejecting it than it truly deserves.

The Government argues that Section 1 of the RCMA assigns to the Plaintiffs the risk of a change in regulatory rules governing the treatment of supervisory goodwill as capital, including the changes mandated by FIRREA. RCMA Section 1 states, essentially, that SCH and the Individual Plaintiffs shall cause SoCal's "regulatory capital" to be "maintained at the level required by § 561.13(b) of the Insurance Regulations" in effect at that time (1986) or *"any successor regulations, as now or hereafter in effect."* RCMA, sec. 1 (emphasis added). The underscored language follows the reference to the "definition" of regulatory capital, and is repeated in the reference to the "levels" of regulatory capital which follows immediately thereafter.

The successor regulation language, presented in the Appendix at Comparison Chart IV, is the same language that was used in the *Statesman* transaction, even as to its repetitive supererogation. The Federal Circuit and the Supreme Court also considered the "assumption of the risk" argument, and, as with the "missing promise" theory, explicitly rejected it. Analyzing the agreements presented in the original Winstar transaction, the Federal Circuit noted that the Winstar, Statesman, and Glendale thrifts were—

> bound to keep in compliance with banking regulations and laws regarding capital levels except to the extent the Bank Board expressly agreed to forbear from enforcing its regulations against it. This stipulation by Winstar to maintain its regulatory net worth at whatever level the regulators set does not, however, eclipse the government's own promise that Winstar could count supervisory goodwill in meeting the regulatory requirements with which it had promised to comply.

*Winstar III*, 64 F.3d at 1544.

A majority of the Supreme Court expressly affirmed the lower courts' rulings on this subject. Indeed, in the opening paragraph of the Principal Opinion, Justice Souter stated:

[W]e hold that the terms assigning the risk of regulatory change to the Government are enforceable, and that the Government is therefore liable in damages for breach. *Winstar IV*, 518 U.S. at 843, 116 S.Ct. 2432.

Further, the Principal Opinion viewed the Defendant's "assumption of the risk" theory as a corollary argument to the "missing promise" theory. Justice Souter, discussing the Statesman transaction, noted that by including in the contract a then-concrete statutory scheme, the Government was contractually bound to honor its promise to apply those same regulations:

> The Government asserts that the reference to § 561.13 of FSLIC regulations, which at the time defined regulatory capital for thrift institutions, indicates that the Government's obligations could change along with the relevant regulations. But, just as in Winstar's case, the Government would have us overlook the specific incorporation of the then-current regulations as part of the agreement. . . .

And continuing:

> It is important to be clear about what these contracts did and did not require of the Government. Nothing in the documentation or the circumstances of these transactions purported to bar the Government from changing the way in which it regulated the thrift industry. Rather, what the Federal Circuit said of the Glendale transaction is true of the Winstar and Statesman deals as well: "the Bank Board and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected" in the agreements between the parties. We read this promise as the law of contracts has always treated promises to provide something beyond the promisor's absolute control, that is, as a promise to insure the promisee against loss arising from the promised condition's nonoccurrence. . . .
> *When the law as to capital requirements changed in the present instance, the Government was unable to perform its promise, and therefore became liable for breach.*

*Id.* at 868–870, 116 S.Ct. 2432 (quoting *Winstar III*, 64 F.3d at 1541–42) (emphasis added).

A review of the "assumption of risk" or "successor regulation" language in Comparison Chart IV does demonstrate some minor textual differences. Section 1 of the SoCal RCMA is longer than Section 1 of Statesman's RCMA, but the meaning is unchanged, and the Government does not argue otherwise. (In August of 1986, the Federal Home Loan Bank Board amended its regulatory net worth regulations. Regulatory Capital Requirements of Insured Institutions, 51 Fed.Reg. 33,565 (Sept. 22, 1986) (to be codified at 12 C.F.R. § 561.13). The new regulations increased the level of and altered the method for calculating regulatory net worth. *Id.* Though final, the new regulations were not expected to be codified until after the SoCal transaction documents were signed. Accordingly, the language in the SoCal documents could not merely cite to the CFR version—it had instead to discuss the new regulatory scheme and cite repeatedly to it, as printed in the *Federal Register.*)

It is important to note that the Supreme Court, reviewing the *Winstar* trilogy, was presented with regulations spanning an eight year period. The Glendale transaction was completed in November 1981; Winstar was completed in July, 1984; and Statesman was completed in March 1988. Accordingly, the Supreme Court's decision is not confined to one edition of statutes or regulations, but rather holds that FIRREA breached insurance regulations spanning from 1981 to 1989. Justice Souter noted that "although substantial changes had been introduced into [the successor regulation language set forth in] § 561.13" by 1988, none of the regulations at issue "resolve the basic ambiguity as to whether goodwill could qualify as regulatory capital." *Winstar IV*, 518 U.S. at 854, n. 9, 116 S.Ct. 2432. The transaction at issue here was completed in April of 1987, and thus the Principal Opinion's reasoning encompasses the version of the regulations set forth in SoCal's contract with the Government.

Finally, we must state that, as with each of the other defenses raised by the Government, other courts have discredited this theory as well. After the Supreme Court's decision in 1996, Judge Smith, relying on Justice

Scalia's opinion in concurrence in *Winstar IV*, rejected the "assumption of risk" argument in *Cal Fed I*:

> If, as the dissent believes, the Government committed only "to provide [certain] treatment unless and until there is subsequent action" [*Winstar IV*, 518 U.S. at 935, 116 S.Ct. 2432], then the Government in effect said "we promise to regulate in this fashion for as long as we choose to regulate in this fashion"—which is an absolutely classic description of an illusory promise.

*Cal Fed I* at 776–78 (citing *Winstar IV*, 518 U.S. at 921, 116 S.Ct. 2432 (Scalia, J., concurring)).

The contractual language before us is no different than that which was before the Supreme Court in *Winstar*. Thus, the Defendant's argument that the Plaintiffs bore the risk that the regulations might change must fail here as well.

### iii. "Reverse Madness"

■ In its efforts to persuade this Court to find no contractual promise with respect to regulatory goodwill, the Government points not to the text of the integrated contract, but to an argument offered by the Principal Opinion in discussing the *Glendale* case, one of the *Winstar* trilogy. In *Glendale*, the new, merged thrift's financial situation was such that absent the goodwill, it would have failed and been subject to penalties "from the moment of its creation." *Winstar III*, 64 F.3d at 1542. In that transaction, the supervisory goodwill was needed from *day one* as an initial remedial component just to bring the thrift into compliance with the capital regulations.

A majority of the Supreme Court pointed to this necessity as part of the evidence that the parties intended that the supervisory goodwill would count towards regulatory capital. The Principal Opinion said:

> [I]t would have been irrational in this case for Glendale to stake its very existence upon continuation of current policies without seeking to embody those policies in some sort of contractual commitment. This conclusion is obvious from both the dollar amounts at stake and the regulators' proven propensity to make changes in the

relevant requirements.... Under the circumstances, we have no doubt that the parties intended to settle regulatory treatment of these transactions as a condition of their agreement.

*Winstar IV*, 518 U.S. at 863–64, 116 S.Ct. 2432 (citations omitted).

Justice Souter concluded his opinion by noting:

> It would, indeed, have been madness for respondents [Winstar, Glendale, Statesman] to have engaged in these transactions with no more protection that the Government's reading would have given them, for the very existence of their institutions would have been in jeopardy from the moment their agreements were signed.

*Id.* at 910, 116 S.Ct. 2432 (emphasis added).

By contrast, the Government points out that while SoCal was ailing, it was not in as bad a condition as the thrift was in *Glendale*. Thus, while the approximately $79 million in supervisory goodwill was helpful in shoring up SoCal's financial statement, it wasn't essential to meet regulatory minimums. As a consequence, the Defendant now argues a "reverse madness" theory; namely, that because it would *not* "have been madness" to enter into this transaction without a binding supervisory goodwill promise, there must have been no promise at all.

As with its first two defenses, the Defendant raises another discredited argument. In addressing the common issues in *Cal Fed I*, Judge Smith discussed the Government's "reverse madness" theory:

> The government's position can be summed up as arguing that if a deal was not insane absent a contractual commitment, then there is no contract. *Seldom has a court heard such a bizarre method of determining contractual intent.* When this proposition is put forth by the United States of America one is almost tempted to wonder if insanity is indeed a prerequisite for contracting with the government.
>
> . . .
>
> The government takes one piece of the evidence of contractual intent found by the

Supreme Court, the Federal Circuit, and this court, and turns that one piece of evidence of intent into a litmus test for when a contract exists in all cases. *This is a rendering of the court's decisions that literally turns them on their heads.* *Cal Fed. I*, 39 Fed.Cl. at 767–68 (emphasis added).

As we note above in Section II, Judge Smith's common issue holdings were not adopted to the remainder of the *Winstar* cases on his docket. Furthermore, we recognize that this latest defense theory has not yet been officially rejected by the appellate courts. This is faint support, indeed.

We are not persuaded for a number of reasons. First, the Supreme Court did not hold that the promise could only exist if the thrift would otherwise have failed at the start. It simply observed that the fact that the thrift would have failed without the inclusion of the supervisory goodwill supported a reading that the parties' clearly intended to contract for that particular promise. The Government offers no authority for treating this factor as a *sine quo non* of the contract.

Second, the parties in both transactions were endeavoring to save a troubled thrift, and were negotiating to put the institution in as strong a position as circumstances permitted. Under these facts, the agreements which comprise the Overall Contract, with the inclusion of the promise to allow the $79 million in supervisory goodwill to count towards regulatory capital, put the new thrift in a regulatory capital position almost one-third greater ($79 million out of a total of $297 million) than it would have been without the goodwill.

The amount of regulatory capital represents more than a "go—no go" regulatory threshold for a thrift. The amount of capital determines how much is available for loans by the institution, the essence of its money-making operation. As the Principal Opinion observed, treating supervisory goodwill and capital credits "as regulatory capital was attractive because it inflated the institution's reserves, thereby allowing the thrift to leverage more loans (and, it hoped, make more profits)." *Winstar IV*, 518 U.S. at 851, 116 S.Ct. 2432.

In the early 1980's, the Government required institutions to have five percent capital on hand to support outstanding loans. *See* Breeden, 59 *Fordham L.Rev.* at S75 (citing Net Worth Amendment, 45 Fed.Reg. 76,111 (1980)). This was later reduced to four percent, and by January, 1982, the FHLBB reduced the capital requirements to three percent. *See id.* (citing Net Worth Amendment, 47 Fed.Reg. 3,543 (1982)). This had the effect of increasing a thrift's leveraging capacity to a ratio of over 33:1. *Id.* That is, for every one dollar of regulatory capital, a thrift could make thirty-three dollars worth of loans.

At three percent, the $217.5 million capital credit and the $79 million in supervisory goodwill together would have supported over nine billion dollars in additional loans. The supervisory goodwill that resulted from the merger would alone have supported over two and a half billion dollars in loans.

We believe it is clear that this leveraging opportunity was a crucial factor in the prospects of a successful rescue of the thrift. The Individual Plaintiffs' Bid Proposal specifically conditioned the offer to form SCH and SoCal and rescue the failing, insolvent thrift on the Government's approval of its goodwill proposal.

The Government's own internal documents, specifically a memorandum to the Bank Board urging the FHLBB to approve the SoCal transaction, dated two days before the Overall Contract documents were signed, indicate just as clearly that it was the Government's belief that the promises as to the capital credit and the treatment of the supervisory goodwill were necessary elements of the transaction.

> SoCal Holdings acquisition of Southern California is to be accounted as a purchase. Assets acquired and liabilities assumed will be adjusted and recorded at their fair values as of the acquisition date. Any excess of the fair value of the assets will be reflected as goodwill. The amortization of the resulting goodwill will be done over a 25 year period in accordance with the Applicant's request for a Regulatory Accounting Principals ("RAP") excep-

tion. In addition, we recommend approval of the Applicant's request for RAP exception to allow the amount of the FSLIC assistance to count as a credit to SoCal Savings Bank's net worth. *These forbearances are critical to the transaction and business plan.*

Alvin W. Smuzynski Memo to the FHLBB, dated April 28, 1987, p. 3 (emphasis added).

This memorandum specifically notes that the FHLBB would be granting two regulatory exceptions to SoCal. Ignoring the relevance of this memorandum, the Government again attempts to raise the "missing promise" theory, arguing that the documents contain no specific promise allowing SoCal to count supervisory goodwill in meeting regulatory capital requirements.

The Smuzynski–FHLBB Memorandum, along with the Bid Proposal, serves as persuasive evidence of the parties' intent to contract for the treatment of SoCal's supervisory goodwill. As Judge Bruggink recently noted:

If supervisory goodwill was not considered by the parties to be a capital asset for regulatory purposes, a contractual amortization schedule designed to eliminate it over time would have been completely unnecessary.

*Home Sav.*, 50 Fed.Cl. at 437.

It is clear to this Court that, at the time the parties were negotiating and executing this transaction, they understood that supervisory goodwill would be included in regulatory capital. We see no basis for ascribing to words in the SoCal documents a meaning different from that given by a majority of the Supreme Court to identical words in the documents it interpreted. Accordingly, this final defense to the Defendant's breach is rejected as well.

## V. CONCLUSION

This Court, like others before, has now addressed at length each of the Government's defenses, and has once again rejected them. Such an exercise was most certainly unnecessary, for as the seven Comparison Charts in the Appendix so vividly illustrate, the "facts and circumstances" in this case, a

phrase oft-used by the Department of Justice in *Winstar*-related filings at the Court, are not at all different from those in the *Statesman* case. Accordingly, we are compelled to arrive at the same conclusions that other judges of this Court, the Federal Circuit, and the Supreme Court have all reached.

In his *Cal Fed* opinion addressing the issues common in these *Winstar* Short Form summary judgment motions, Senior Judge Smith wrote:

In the instant cases the United States has not acted in a manner worthy of the great just Nation it is. Because the dollars at stake appear to be so large the government has raised legal and factual arguments that have little or no basis in law, fact or logic.

While the court can appreciate the concerns of the government's attorneys to protect the public treasury, and they are honorable people, it must severely criticize the tactics and approach of the government in these motions for summary judgment.

*Cal Fed. I*, 39 Fed.Cl. at 754.

We have no reason to believe that then-Chief Judge Smith was unjustified in his harsh criticism of the Government's behavior as of 1997. Unfortunately, over four years later, the Government's tactics have not improved. Indeed, they have even less justification with the passage of time.

Fifteen years after the transactional documents were signed, the Court concludes that they established a valid, binding express contract between the Government, the Institutional Plaintiffs, and the Individual Plaintiffs. The Government breached that contract when it enacted FIRREA, and with respect to two promises—the capital credit and supervisory goodwill. We do not, of course, mean to imply by these liability conclusions any particular quantum of recoverable damages. That we leave for the next phase.

We need not address Count 2 (breach of an implied-in-fact contract), Count 3 (breach of duty of good faith), or Count 4 (restitution for breach of contract). In 1999, then-Chief Judge Smith, in his capacity as *Winstar*-Managing Judge for the Court, stayed the

Plaintiffs' constitutional claims. By an Order dated January 29, 2002, we denied the Defendant's motion to dissolve the stay on the Plaintiffs' constitutional claims, and thus we do not now reach Counts 5 (taking without just compensation) or 6 (due process violation).

**Plaintiffs' Short Form Motion for Partial Summary Judgment is GRANTED as to Count 1, breach of an express contract,** the Defendant's Cross Motion for Partial Summary Judgment is DENIED, and the case is continued for further proceedings to determine damages.

Pursuant to this Court's March 15, 2002, Order suspending the *Winstar* Amended Master Protective Order (AMPO) and lifting the seal off the files in this case, the Clerk of Court is directed to file this Opinion among the Court's public files. *See S. Cal. Fed. Sav. and Loan Assoc. v. United States,* 52 Fed.Cl. 20 (2002) *(AMPO Order).*

**IT IS SO ORDERED.**

*APPENDIX—Comparison Chart I*

| *Statesman* **Documents** | *Southern California* **Documents** |
|---|---|
| *Statesman Assistance Agreement,* "*Accounting Principles*" *Clause—* Section 17, **March 11, 1988:** "Except as otherwise provided, any computations made for purposes of this Agreement shall be governed by GAAP, except that where such principles conflict with the terms of this Agreement, applicable regulations of the Bank Board or the [FSLIC], or any resolution or action of the Bank Board approving or relating to the Acquisition, the Mergers or to this Agreement, then this Agreement, such regulations, or such resolution or action shall govern. | *SoCal Assistance Agreement,* "*Accounting Principles*" *Clause—* Section 13, **April 30, 1987:** "Except as otherwise provided herein, any computations made for the purposes of this Agreement shall be governed by GAAP as applied in the savings and loan industry, except that where such principles conflict with the terms of this Agreement, applicable regulations of the Bank Board or the [FSLIC], or any resolution or action of the Bank Board approving or relating to the Conversion, the Acquisition or this Agreement, then this Agreement, such regulations, or such resolution shall govern. |
| In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with such regulations and the Bank Board's resolution or action relating to the Acquisition. | In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with such regulation and the Bank Board's resolution or action. |
| If there is a conflict between such regulations and the Bank Board's resolution or action relating to the Acquisition, the Mergers or to this Agreement, the Bank Board's resolution or action shall govern. | If there is a conflict between such regulations and the Bank Board's resolutions or actions relating to the Conversion, the Acquisition or this Agreement, the Bank Board's resolutions or actions shall govern. |
| For purposes of this section, the accounting principles and governing regulations shall be those in effect on the Effective Date, as subsequently changed, amended, clarified or interpreted by the Bank Board (as proposed, for example, at 52 *Fed.Reg.* 39112 *et seq.* (October 20, 1987)), its staff, or the Financial Accounting Standards Board ("FASB"), or any successor organization of the American Institute of Certified Public Accountants ("AICPA"). If there is a conflict between what is required by the FASB or the AICPA and what is required by the | For purposes of this Section, the accounting principles and governing regulations shall be those in effect on the Effective Date or as subsequently clarified or interpreted by the Bank Board or the Financial Accounting Standards Board ("FASB"), or any successor organization of the American Institute of Certified Public Accountants. Where there is a conflict between what is required by the FASB and the Bank Board, the interpretation of the Bank Board's accountants shall govern." |

Bank Board, the interpretation of the Bank
Board shall govern."

## Comparison Chart II

| *Statesman* Documents | *Southern California* Documents |
|---|---|
| *Statesman* Assistance Agreement, "Entire Agreement & Severability" Clauses—Section 23: | *SoCal* Assistance Agreement, "Entire Agreement & Severability" Clauses—Section 18: |
| "(a) This Agreement, together with any resolutions adopted by the Bank Board and documents delivered at closing which contain written interpretations or understandings of the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only the Acquisition Agreement, the Merger Agreements and any resolutions or letters concerning the Acquisition, the Mergers or this Agreement issued by the Bank Board or the [FSLIC] in connection with the approval of the Acquisition, the Mergers and this Agreement, | "(a) This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only any resolutions or letters concerning the Conversion, the Acquisition or this Agreement issued by the Bank Board or the [FSLIC] in connection with the approval of the Conversion, the Acquisition, and this Agreement. |
| *provided*, however, that in the event of any conflict, variance, or inconsistency between this Agreement and the Acquisition Agreement or the Merger Agreements, the provisions of this Agreement shall govern and be binding on all parties insofar as the rights, privileges, duties, obligations, and liabilities of the parties are concerned. | [No Comparable Provision] |
| (b) If any provision of this Agreement is invalid or unenforceable, all of the remaining provisions of this Agreement shall nevertheless remain in full force and effect and shall be binding upon all the parties hereto." | (b) If any provision of this Agreement is invalid or unenforceable, all of the remaining provisions of this Agreement shall nevertheless remain in full force and effect and shall be binding upon the [FSLIC], the ACQUIRER and the NEW ASSOCIATION." |

## Comparison Chart III

| *Statesman* Documents | *Southern California* Documents |
|---|---|
| *Statesman* Assistance Agreement, "Sole Benefit" Clause—Section 26: | *SoCal* Assistance Agreement, "Sole Benefit" Clause—Section 21: |
| "It is the intention of the parties that this Agreement, the assumption of obligations and statements of responsibilities under it, and all of its conditions and provisions are for the sole benefit of the parties hereto and for the benefit of no other person . | "It is the intention of the parties that this Agreement, the assumption of obligations and statements of responsibilities under it, and all of its conditions and provisions are for the sole benefit of the parties hereto and for the benefit of no other person. |
| Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person other than the parties hereto any legal or equitable right, remedy, or claim under, or in respect to, this Agreement or any of its provisions." | Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person other than the parties hereto any legal or equitable right, remedy, or claim under, or in respect to, this Agreement or any of its provisions." |

## Comparison Chart IV

| *Statesman* Documents | *Southern California* Documents |
|---|---|
| *Statesman Regulatory Capital Maintenance Agreement,* March 11, 1998, Section 1: | *SoCal Regulatory Capital Maintenance Agreement,* April 30, 1987, Section 1: |
| "So long as the ACQUIRER directly or indirectly controls the ACQUIRING ASSO-CIATION, as the term 'control' is defined in Part 574 of the Insurance Regulations, 12 C.F.R. Part 574 (1987), or any successor regulation, as now or hereafter in effect, | "So long as the ACQUIRER directly or indirectly controls the NEW ASSOCIA-TION, as the term "control" is defined in Part 574 of the Insurance Regulations, 12 C.F.R. Part 574 (1986), or any successor regulation, as now or hereafter in effect, |
| the ACQUIRER and the ACQUIRING AS-SOCIATION shall cause the 'regulatory capital' as defined in § 561.13 of the Insurance Regulations, 12 C.F.R. § 561.13 (1987), or any successor regulation, as now or here-after in effect, | the ACQUIRER and the NEW ASSOCIA-TION shall cause the 'regulatory capital' as defined in § 561.13 of the Insurance Regula-tions, 12 C.F.R. § 561.13 (1986), or any suc-cessor regulation, as now or hereafter in effect, |
| of the ACQUIRING ASSOCIATION ("AC-QUIRING ASSOCIATION's Regulatory Capital") to be maintained at the level ("Re-quired Regulatory Capital") required by § 561.13(b) of the Insurance Regulations, 12 C.F.R. § 561.13(b) (1987), or any successor regulation, as now or hereafter in effect ("Regulatory Capital Regulation"), | of the NEW ASSOCIATION to be main-tained at the level required by § 561.13(b) of the Insurance Regulations, 51 Fed.Reg. 33,565 (1986) (to be codified at 12 C.F.R. § 561.13(b) (1987), or any successor regula-tion, as now or hereafter in effect ("Regula-tory Capital Regulation") ("Required Regu-latory Capital"), |
| without regard to any net worth assistance for which the ACQUIRING ASSOCIA-TION may qualify pursuant to § 406(f)(5) of the NHA, 12 U.S.C. § 1729(f)(5) (1982), as in effect now or as reenacted or amended in the future, and the regulations of the FSLIC issued pursuant to § 406(f)(5), or any successor regulation, as now or hereaf-ter in effect. | without regard to any net worth assistance for which the NEW ASSOCIATION may qualify pursuant to § 406(f)(5) of the NHA, 12 U.S.C. § 1729(f)(5) (1982), and the regu-lations of the [FSLIC] issued pursuant to § 406(f)(5), or any successor statute or reg-ulations, as now or hereafter in effect, |
| [No Comparable Provision] | *provided* that for the purposes of § 561.13(b) of the Regulatory Capital Regu-lations, (i) the [FSLIC], pursuant to its au-thority under § 563.13(b)(7)(iii) of the Regu-latory Capital Regulation, shall consider the NEW ASSOCIATION's 'base liabilities,' as defined in § 563.13(b)(1)(ii) of the Regulato-ry Capital Regulation, to be the lower of the NEW ASSOCIATION's level ". . . of 'total liabilities,' as defined in § 563.13(b)(1)(i) of the Regulatory Capital Regulation ("Total Liabilities"), as of (A) the effective date of the acquisition (end of the day) and (B) the end of the period for which regulatory capi-tal is being computed, and (ii) the [FSLIC], pursuant to its authority under § 563.13(b)(7)(iii) of the Regulatory Capital Regulation, shall consider the NEW ASSO-CIATION's 'base ratio,' as defined in § 563.13(b)(2)(iii) of the Regulatory Capital Regulation, to be 3 percent, and |

[No Comparable Provision]

*provided further,* that regardless of any changes in the method of calculating regulatory capital or the items includable in such calculation, the $217.5 million of assistance from the [FSLIC] shall be includable in capital for purposes of determining whether the NEW ASSOCIATION has maintained its regulatory capital at the Required Regulatory Capital level.

The form of any capital infusion required by this § 1 must be acceptable to the Principal Supervisory Agent of the Bank Board, Des Moines, Iowa, or his designee ("P.S.A.")."

The form of any capital infusion required by this § 1 must be acceptable to the Principal Supervisory Agent of the Bank Board, San Francisco, California, or his designee ("P.S.A.").

| *Comparison Chart V* | |
|---|---|
| *Statesman* **Documents** | *Southern California* **Documents** |
| ***Statesman RCMA,* Section 2:**<br>"For purposes of this Agreement, any determination of the ACQUIRING ASSOCIATION's Required Regulatory Capital shall be calculated by the FSLIC or the P.S.A., and shall include in the ACQUIRING ASSOCIATION's Required Regulatory Capital amounts permitted by the FSLIC in the Assistance Agreement and in the forbearances issued in connection with the transactions discussed therein." | ***Socal RCMA,* Section 2:**<br>"For purposes of this Agreement, any computation of the NEW ASSOCIATION's Required Regulatory Capital shall be determined by the P.S.A., in accordance with applicable regulations, standards and procedures generally applicable to institutions under the P.S.A.'s jurisdiction and the second proviso of § 1, and shall reflect any directives issued by the P.S.A., in accordance with such regulations, standards and procedures and the second proviso of § 1, regarding the NEW ASSOCIATION's calculation of Required Regulatory Capital." |

| *Comparison Chart VI* | |
|---|---|
| *Statesman* **Documents** | *Southern California* **Documents** |
| ***Statesman FHLBB Resolution No. 88–169,* March 11, 1998:**<br>"RESOLVED FURTHER, That the Acquisition and the Mergers shall be accounted for, and [Statesman] shall report to the Bank Board and the FSLIC, in accordance with generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC, except to the extent of the following departures from generally accepted accounting principles: | ***SoCal FHLBB Resolution No. 87–511,* April 30, 1987:**<br>"RESOLVED FURTHER, That SoCal Holdings and the New Association shall submit to the Principal Supervisory Agent an independent certified public accountant's opinion that each has accounted for the Acquisition in accordance with generally accepted accounting principles ("GAAP") or in accordance with GAAP as it may be modified by the following procedures, which shall be employed: |
| [No Comparable Provision] | (a) Push-down accounting shall be used to reflect the Acquisition on the books of the New Association; |
| (a) Twenty-one million dollars of the initial contribution by the [FSLIC] to [Statesman], and five million dollars of the principal amount of the Subordinate Debenture issued to the FSLIC, pursuant to § 6 of the Assistance Agreement, shall be credited to | (b) The cash contribution by the FSLIC to the New Association, pursuant to the Assistance Agreement, may be deemed a contribution to regulatory capital and may be booked as a direct credit to the New Association's regulatory capital; and |

the regulatory capital account of [Statesman]; and

(b) The value of any unidentifiable intangible assets resulting from accounting for the Acquisition in accordance with the purchase method of accounting may be amortized by [Statesman] over a period not in excess of twenty-five (25) years by the straight line method."

(c) The value of any intangible assets resulting from the Acquisition shall be amortized by the New Association over a period not to exceed 25 years by the straight line method."

| Comparison Chart VII | |
|---|---|
| **Statesman** *Documents* | **Southern California** *Documents* |
| *Statesman Forbearance Letter,* March 14, 1988: "In connection with approval by the [FHLBB] of the assisted transaction of [thrifts to be acquired] by [Statesman] . . . the following forbearances are hereby granted: | *SoCal Forbearance Letter,* May 27, 1987: "Concurrent with the approval of the [SoCal] transaction, the following forbearances are granted: |
| 1. The acquisition of control of the associations by [Statesman] has been deemed to be an acquisition instituted for supervisory reasons. Therefore, the [FSLIC] will forbear, for a period not to exceed five years following consummation of the acquisition, from exercising its authority under Section 563.13 of the Insurance Regulations, for any failure of [Statesman] to meet the regulatory capital requirements. . . . | 1. The assets acquired by [SoCal] . . . will be deemed to have been acquired in an acquisition instituted for supervisory reasons. Therefore, pursuant to any section of the regulations administered by the [FHLBB] . . . scheduled items attributable to [SoCal] shall be excluded from the computation of scheduled items in determining whether [SoCal] meets the requirements of such sections following the effective acquisition date. |
| 3. It is the FSLIC's intention [sic] $21 million of the case contribution to be made to [Statesman] pursuant to an assistance agreement to be entered intro between the FSLIC and [Statesman] and the $5 million subordinated debenture are to be a credit to [Statesman's] regulatory capital; therefore, for regulatory accounting purposes, [Statesman] may book such contribution as a direct addition to its regulatory capital. | 2. Not later than 60 days following the effective date of the acquisition, [SoCal] shall submit to the Supervisory Agent an independent certified public accountant's opinion that [SoCal] has accounted for the acquisition in accordance with generally accepted accounting principles ("GAAP"), or in accordance with GAAP except to the extent that the following may depart from GAAP and which is hereby approved by the Board for purposes of regulatory reporting by [SoCal] to the Board: |
| 4. Not later than 90 days following the effective date of the merger, [Statesman] shall submit to the Supervisory Agent an independent certified public accountant's opinion that [Statesman] has accounted for the merger in accordance with generally accepted accounting principles except that as herein provided by the Board, for purposes of reporting to the Board the cash contribution by the FSLIC to [Statesman] with respect to the associations, pursuant to the assistance agreement, and the $5 million subordinated debenture shall be booked as a direct credit to [Statesman]." | (a) the cash contribution by the FSLIC to [SoCal] with respect to [SoCal] pursuant to the Assistance agreement shall be deemed a contribution to regulatory net worth, and may be booked as a direct credit to [SoCal], |

(b) the value of any unidentifiable intangible assets resulting from accounting for the acquisition in accordance with the purchase method may be amortized by SoCal Federal over a period not exceed 25 years by the straight line method."